CINE 42nd STREET THEATER CORPORATION, Leonard Clark and the Brandt Organization, Inc., Plaintiffs-Appellants,

v.

The NEDERLANDER ORGANIZATION, INC.; Harris Nederlander, Inc.; Jujamcyn Company, Inc.; Cambridge Investment Group, Ltd.; Park Tower Realty Corp.; the New York State Urban Development Corporation; Times Square Redevelopment Corporation and the City of New York, Defendants-Appellees.

No. 124, Docket 85–7412.

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1985.

Decided May 14, 1986.

James E. Daniels, New York City (Barbara L. Levine, Neil G. Sparber, Warshaw Burstein Cohen Schlesinger & Kuh, New York City, of counsel), for plaintiffs-appellants Cine 42nd Street Theater Corp. and Leonard Clark.

Martin J. Schwartz, New York City (Rubin Baum Levin Constant & Friedman, New York City, of counsel), filed a brief for plaintiff-appellant The Brandt Organization, Inc.

Francis F. Caputo, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York, of counsel), for defendant-appellee The City of New York.

Irving Scher, New York City (Weil, Gotshal & Manges, New York City, of counsel) for defendants-appellees The Nederlander Organization, Inc., Harris Nederlander, Inc. and New Amsterdam Nederlander, Inc.

Robert Bicks, New York City (Breed, Abbott & Morgan, New York City, of counsel), for defendants-appellees Jujamcyn Co., Inc. and Cambridge Investment Group, Ltd.

Gerald Sobel, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant-appellee Park Tower Realty Corp.

Susan M. Heilbron, New York City, for defendants-appellees, N.Y. State Urban Development Corp. and Times Square Redevelopment Corp.

Before NEWMAN, CARDAMONE and MINER, Circuit Judges.

CARDAMONE, Circuit Judge:

New York's Urban Development Corporation (UDC) and New York City, together with private parties, are engaged in a development project designed to revitalize the Times Square area. Under the plan, five moviehouses in the Broadway Theater district are being acquired by the UDC and leased to private parties to renovate and operate them as Broadway Theaters. This appeal presents the novel question of whether the developers of this project are immune from the provisions of the federal antitrust laws.

A state's attempt to regulate its own domestic economy that results in anticompetitive consequences brings two divergent beliefs into sharp conflict. The first, embedded in our federalist system, holds that states are sovereign powers and—absent constitutional constraints—entitled to act independently, even when such leads to anticompetitive economic activity. The second tenet is that our economy is grounded on the free enterprise system and that anticompetitive economic activity is prohibited by antitrust law. Resolving the conflict between these concepts is our task.

Beyond doubt free competition undergirds our economy. But the State urges that private enterprise cannot effectively deal with the problems of urban decay, and contends that exclusive reliance on free enterprise may leave its cities as desolate as the nothingness Shelley described beside Ozymandias. "Round the decay Of that colossal wreck, boundless and bare, The lone and level sands strech far away." [1] Concerned that unchecked urban blight could produce a similar wasteland, and persuaded that free enterprise alone could not reverse its spread, the state crafted a vehicle to solve this persistent problem, even though that redevelopment effort might involve anticompetitive activity.

Appellants Cine 42nd Street Theater Corporation, Leonard Clark and the Brandt Organization, Inc. presently have contractual interests in the five moviehouses to be leased and were unsuccessful bidders for the theater development rights. As plaintiffs below they challenged the designation of those rights to the private appellees— the Nederlander Organization, Inc., Jujamcyn Company, Inc. and Cambridge Investment Group, Ltd.—made by the public appellees, the New York State Urban Development Corporation and the City of New York. The complaint alleged awarding interests in the development project to the private appellees would substantially lessen competition in the Broadway Theater market and thus violate the Clayton Act, 15 U.S.C. § 15 *et seq.* (1982) and New York's Donnelly Act, N.Y.Gen.Bus. Law §§ 340–349–a (McKinney's 1968 & Supp.1986). Appellees' motion to dismiss the complaint was granted by judgment dated April 18, 1985 in the United States District Court for the Southern District of New York (Conner, J.), 609 F.Supp. 113. Appellants challenge the district court's holding that appellees were entitled to a state action defense under the Clayton Act. We agree with the district court's conclusion, but take a somewhat different path to reach it.

## I Background

A. *Formation, Purpose and Powers of the New York State Urban Development Corporation*

In 1968, the New York State Legislature confronted the persistent problem of urban blight. Recognizing that many localities were in decay and unsanitary, thereby depriving citizens of educational, cultural, and residential opportunities, the legislature enacted the New York State Urban Development Corporation Act. 65 N.Y.Uncon.L. § 6251 *et seq.* (McKinney 1980 & Supp.1986) (Act or UDC Act). The Act created the UDC as the vehicle to reverse urban decay.

The UDC is "a corporate governmental agency of the state, constituting a political subdivision and public benefit corporation." UDC Act § 6254(1) (McKinney Supp.1984).

---

**1.** Shelley, *Ozymandias of Egypt,* in 41 Harvard Classics 874 (Eliot ed. 1910).

Two of its nine member governing board are public officials—the superintendent of banking and the chairman of the State Science and Technology Foundation. Subject to the advice and consent of the state senate, the remaining seven directors are selected by the governor who also designates one of the seven as chairperson. Currently, the directors serve four year terms.

The agency is designed to make the State an active participant in the financing and construction of urban renewal projects. *See* Governor's Memorandum on Approval of Urban Development Program, *reprinted in* 1968 N.Y.Sess.Laws 2359 (February 27, 1968). As such, the UDC represents legislative recognition that private enterprise cannot by itself rebuild the State's cities, and that other methods of obtaining funds, such as state-wide voting referendums, are ineffectual. *See* Osborn, *New York's Urban Development Corporation: A Study on the Unchecked Power of a Public Authority*, 43 Brooklyn L.Rev. 237, 237–41 (1977) (*New York's UDC*).

From its inception the UDC was structured to operate independently, free from the political and bureaucratic inertia that had delayed other projects and made them unattractive investments to the private sector. Although a creature of statute, the UDC derives its powers directly from the State Constitution. *Floyd v. N.Y.S. Urban Development Corp.*, 33 N.Y.2d 1, 7, 347 N.Y.S.2d 161, 300 N.E.2d 704 (1973). As a public benefit corporation it exercises governmental authority, although it does so independently of the State. *Smith v. Levitt*, 37 A.D.2d 418, 421, 326 N.Y.S.2d 335 (3d Dep't 1971), *aff'd mem.*, 30 N.Y.2d 934, 335 N.Y.S.2d 687, 287 N.E.2d 380 (1972); *see* Osborn, *New York's UDC* at 237–38 & n. 4.

Its powers are as broad and diverse as the problems it is designed to address. While the UDC was given generalized powers to improve the urban environment, it was also granted specific authority to enter into lease arrangements, to acquire property through purchase or condemnation, and to hold, sell or otherwise transfer this property either to public or private third parties. UDC Act § 6255.

Because this case involves the leasing of land for land use improvement projects, we examine that aspect of the UDC's powers with greater particularity. Pursuant to § 6256(1) the UDC may enter into 99-year leases with any third party, whether public or private, when the land is to be used for a land use development project. Although leases may be auctioned through competitive bidding, such bidding is not mandatory. Further, public notice is only necessary if the lease is awarded to a "person, firm, partnership, or corporation," rather than a housing company or local development corporation. *Id.* at (a), (b), (c).

The sole limitation placed on the UDC's leasing power—within the context of land use improvement projects—is that it must first find that the proposed project will actually improve a previously decayed area. *See id.* This limitation as further defined in § 6260 requires the agency to make three findings prior to awarding a lease and undertaking such an improvement project: first, the target area must qualify as a "substandard or unsanitary area, or [be] in danger of becoming" such an area, UDC Act § 6260(c)(1); second, the designated project must actually improve the target area in a manner consistent with the underlying legislative purpose, *see id.* at (c)(2); third, the project must solicit and incorporate, to the greatest extent possible, the active participation of private business interests, *id.* at (c)(3).

The UDC is encouraged to work actively with municipalities. UDC Act § 6266. To permit municipalities to enter freely into coordinated projects with the UDC, the Act specifically authorizes municipalities to contract with the agency notwithstanding prohibitions to the contrary. *Id.* at 6266(6). The specific grants and powers conferred upon the UDC make it a powerful engine for social change. Its powers include: developing projects without regard to local zoning, building, or other local laws, UDC Act § 6266, and funding, building, leasing, selling or managing facilities, free from

"any taxes, other than assessments for local improvements, upon or in respect of a project or of any property ... of the corporation" otherwise assessable by the State or its political subdivisions, *id.* § 6272. To accomplish its large scale goals, the UDC was empowered to issue bonds and notes for a principal amount well over $1 billion, UDC § 6268; in UDC Act § 6270 the State takes upon itself the "moral obligation" to stand behind the UDC's indebtedness, so as to attract private investment in its debt obligations. It was further armed with an entitlement that its provisions control over inconsistent provisions "of any other law, general, special or local...." *Id.* § 6283. The legislature finally declared that the Act "being necessary for the welfare of the state and its inhabitants, shall be liberally construed so as to effectuate its purposes." *Id.* § 6284.

## B. *The Forty-Second Street Redevelopment Project*

We turn now to the UDC's use of its leasing power in the instant case, that is, in connection with the Forty-Second Street Redevelopment Project (the Project).[2] Because this appeal is from a judgment dismissing the complaint pursuant to Fed.R. Civ.P. 12(b)(6), we accept as true the facts alleged in appellants' antitrust complaint.

Those facts reveal the following. The Times Square area has been a frequent source of pride and also of embarrassment to the City of New York. As the home of the Broadway theater industry, it is a world-wide cultural attraction. But as an area of high crime, pornography, and dilapidated housing, it projects a sorry image of urban blight. The Project, created to redevelop this culturally and economically important area of the City, was initiated on June 27, 1980 when the City and the UDC entered into an agreement for a joint redevelopment of the area surrounding West Forty-Second Street. The renovation of existing moviehouses into live theaters suitable for Broadway productions was among the Project's goals.

The overall plan envisioned the UDC acquiring certain targeted theaters—through condemnation or purchase—and then leasing them together with the accompanying real estate, through competitive bidding, to private parties who would renovate and use them as Broadway theaters. Tax abatements and other forms of public assistance were to be provided to ease the private developers' financial burden. To this end, the Project area was divided into a number of "Development Sites." On Site 5 three theaters—the Apollo, Selwyn and Lyric— were designated to become new Broadway theaters. The New Amsterdam and Harris theaters located on Site 6 were similarly designated. Appellant Brandt Organization through its controlling interest in The Forty-Second Street Company presently operates the three theaters located on Site 5. Appellant Cine 42nd now operates the Harris theater pursuant to a long-term lease with an option to buy. The New Amsterdam theater was purchased by appellee The Nederlander Organization prior to the bidding here at issue.

Having selected the theaters to be available for private purchase and renovation, the City and UDC issued, in June 1981, the 42ND STREET DEVELOPMENT PROJECT REQUEST FOR DEVELOPMENT PROPOSALS (Request for Proposals). Accompanying the Request for Proposals were the Design Guidelines and Special Features Supplement. These documents set forth the Project's purpose and the criteria by which winning bidders would be selected. Appellants submitted timely bids for those theaters in which they already had a contractual interest.

On April 6, 1982 appellee, The Nederlander Organization, was "conditionally designated" to become the lessee for the Harris and New Amsterdam theaters. The Selwyn, Apollo, and Lyric theaters were "conditionally designated" to be leased to appellees Jujamcyn Company and the Cambridge Investment Group as joint develop-

---

**2.** The Times Square Development Corporation, a named defendant-appellee, is a subsidiary corporation of the UDC. It was organized in 1982 to implement this Project. UDC Act § 6262.

ers. These designations were made in accordance with the criteria announced for selection. Funding for the Harris Theater lease as well as for the costs of the leases for the Selwyn, Apollo and Lyric, was provided by appellee Park Tower Realty Corp. Memoranda of Terms were signed for each of the theaters and on October 4, 1984 the UDC Board of Directors approved the Project and the conditional designations.

## C. *Appellants' Antitrust Allegations*

Appellants' complaint alleges that these leases are acquisitions that violate § 7 of the Clayton Act. Section 7 violations result, they assert, because awarding the leases to appellees will lessen competition within the Broadway theater industry; erect barriers preventing new competitors from entering the relevant market; and increase the opportunity for, and likelihood of, collusive behavior among the remaining theater owners.

Appellants sue in their capacity as former movie theater operators who are losing their rights in these theaters and as private attorneys-general. The antitrust injury allegedly suffered results directly from the loss of their leases, the increased difficulty they will face in gaining entry into the Broadway theater market, and the harm they will suffer as private parties forced to pay higher prices because of the collusive and monopolistic pricing policies they allege will result from these acquisitions. In their prayer for relief, appellants requested an order enjoining the UDC, the City of New York and the private appellees from proceeding with the Project. In addition, they sought a declaratory judgment that the conditional designations of appellees as lessees violated the antitrust laws.

In count two of their complaint appellants urge that these same events also violated New York State's Donnelly Act. They contend that the state claim was properly before the district court under the doctrine of pendent jurisdiction, because the alleged state violation arose from the same operative facts that provided the basis for the federal claims.

## D. *The District Court Opinion*

The district court ruled that the public appellees were entitled to claim a state action defense under the Clayton Act. Although it concluded that the legislature failed to retain sufficient control over the UDC's actions, so as to attribute the UDC's acts *directly* to the state, the district court determined that the UDC could claim the state action defense because "the legislature clearly and affirmatively authorized it to engage in the anticompetitive conduct at issue here." It ruled that consistent with *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), New York City was subject to and satisfied the same test. Having found the state action defense applicable to the public defendants, the district court extended it to the private defendants noting that "[i]t would be anomalous indeed to hold that the UDC and the City are exempt from antitrust scrutiny because they made their conditional designations pursuant to state authorization, and to hold at the same time that the developers who merely applied for and received those designations are not." (citation omitted). Having dismissed the federal claim, the court declined to exercise pendent jurisdiction over the state claim.

## II   Analytic Framework

## A. *The State Action Defense and the Clayton Act*

Appellants frame their cause of action under § 7 of the Clayton Act. Appellees claim that, under the state action defense, their activities are not preempted by federal antitrust laws. This presents a novel issue because to date all Supreme Court precedents have applied the state action defense solely within the context of a § 1 Sherman Act claim. 15 U.S.C. § 1 (1982). Similarly, no circuit court has yet ruled on whether this defense may also shield alleged Clayton Act violations. Consequently, before deciding whether a state action defense is available under the facts of this case, we must first determine whether it may ever be applied in a Clayton Act context.

The theory that action by a state is not prohibited by federal antitrust law originates in *Parker v. Brown,* 317 U.S. 341, 350–52, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943), where the Supreme Court in analyzing the Sherman Act's language and legislative history found no evidence of a congressional aim to occupy the field of existing state economic regulation, but only a desire to prevent "business combinations." The Court concluded that—absent an express congressional purpose to the contrary—principles of federalism required that state sovereignty be respected. *Id.;* see Areeda, *Antitrust Immunity for 'State Action' After* Lafayette, 95 Harv.L. Rev. 435, 437 (1981).

The provisions of the Sherman Act were only applicable to the decision to create the state action defense to the extent that the Court had to decide first whether the language or legislative history of the Act demonstrated a purpose to displace state with federal regulation. *Parker* is not a Sherman Act case as such; rather, it is a preemption case whose primary teaching is that state economic regulation should not be preempted by federal antitrust laws without explicit evidence that such is Congress' will. Handler, *Reforming the Antitrust Laws,* 82 Col.L.Rev. 1287, 1330 (1982).

Determining whether the rule adopted in *Parker* should be extended requires an analysis of the different focus between the Clayton and Sherman Acts. Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, *in restraint of trade* or commerce among the several States...." 15 U.S.C. § 1 (1982) (emphasis added). Consequently, antitrust analysis under § 1 necessitates an examination of the immediate and short-term effects of a combination. Section 7 of the Clayton Act is designed to prevent acquisitions where "the *effect* of such acquisition may be substantially to lessen competition, or to *tend* to create a monopoly." 15 U.S.C. § 18 (emphasis added). Its focus is therefore on the future, that is to say, whether today's acquisition will bring tomorrow's loss of competition.

Appellants argue that there is only a forward perspective to § 7, and because of this, they contend that a state action defense is not available under the Clayton Act. How can a state effectively regulate anticompetitive activities that have not yet and may never occur? If state regulation of such harm is logically impossible—as opponents of the state action defense argue—then federal regulation obviously would not be supplanting such state regulatory activities, and the concerns of federalism underlying *Parker* would not be implicated.

But the premise that the Clayton Act has a future perspective does not logically lead to a conclusion that such bars the state action defense. Accepting for the moment the proposition that there is a difference in the time orientations of the two statutes, one cannot ignore the fact that, in enacting and amending § 7 of the Clayton Act, Congress itself was also regulating an unpredictable future, just as the states are doing by passing regulations that permit anticompetitive conduct. Congress plainly may pursue such a course. By doing so, it is anticipating future problems and formulating potential solutions. States possess similar institutional capabilities. Thus, there is no principled basis to hold, on the one hand, that Congress can create regulations to police potential anticompetitive conduct and to rule, on the other, that state legislatures and agencies are incapable of anticipating the potential consequences of present conduct.

At an even more fundamental leval, viewing § 7 simply as a forward-looking antitrust provision misinterprets both its purpose and its utility. The difference between the Sherman and the Clayton Acts is not necessarily one of present versus future focus. Admittedly, the Sherman Act looks at a proposed merger or acquisition and asks whether that specific action will create a monopoly or is a present exercise of monopoly power. But the Clayton Act also looks to the specific act. Its purpose is to determine whether the acquisition—

while not creating a present monopoly or a conspiracy in restraint of trade—nonetheless immediately produces substantial anticompetitive effects, which can be presently ascertained from economic studies of the relevant product market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 321–22, 82 S.Ct. 1502, 1521–22, 8 L.Ed.2d 510 (1962); *see* P. Areeda, *Antitrust Law* §§ 903–04 (1978 & Supp.1982). This remains its purpose today.

The Clayton Act thus also regulates present conduct which immediately signals the possibility of future anticompetitive results. One need not wait for the future to find a Clayton Act violation. The fact that appellants are before us arguing that the Clayton Act has been violated by these lease arrangements evidences that unlawful conduct under the Act occurs not in the future, but as soon as potential anticompetitive results can be detected. As such, it is not necessary for future events to unfold to regulate economic activity under the Clayton Act. Hence, when a state devises its own economic regulation contrary to the mandates of the Clayton Act, it may purport to regulate the future, but it does so by recognizing immediate and present actions which are Clayton Act violations.

Finally, reading the language and legislative history of § 7 in the same way that the Supreme Court analyzed the language and legislative history of the Sherman Act in *Parker*, it is apparent that neither reveals any purpose to displace state economic regulation with federal law. Section 7 is preventive not preemptive medicine. As a consequence, the fact that § 7 historically serves to prevent incipient monopolies is not a reason to displace state regulation in a § 7 setting. We conclude therefore that the state action defense is generally available to parties defending against a § 7 Clayton Act violation. It remains to analyze whether appellees may successfully assert that defense in this case.

## B. *The Applicable Legal Standard*

### 1. Case Law From *Parker v. Brown*

Discussion of the state action defense must begin with *Parker v. Brown*, 317 U.S.

341, 63 S.Ct. 307, 87 L.Ed. 315. There a cartel of private raisin producers organized to stabilize prices under the auspices of California's Agricultural Prorate Act. An action was commenced against state officials seeking to enjoin them from enforcing the state raisin marketing program. The Supreme Court realized that the state scheme was anticompetitive, but because the state created the machinery for establishing and enforcing the program, the Court found nothing in the Sherman Act that would nullify California's ability to regulate its own domestic commerce. *Id.* at 352, 63 S.Ct. at 314. The view expressed in *Parker*—which became known as state action immunity—attempts to resolve the existing tension between principles of federalism and the goal of open competition in the marketplace embodied in the Sherman and Clayton Acts. For over three decades following *Parker* the state action defense to federal antitrust laws remained uncontested. In the last ten years several decisions of the Supreme Court have reviewed the balance between concepts of federalism and federal antitrust law.

It is useful to trace the evolution of those cases beginning with *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). That case held that mere *enforcement* by the Virginia State Bar of a county bar association's minimum fee schedule was not the act of the State of Virginia as sovereign. "It is not enough that, as the County Bar puts it, anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Id.* at 791, 95 S.Ct. at 2015. Hence, the Supreme Court held that the fee schedule was subject to the provisions of the Sherman Act. *Id.* at 793, 95 S.Ct. at 2016. In *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), Detroit Edison, a private, regulated utility distributing electricity, also supplied consumers with 50 percent of their light bulbs without charge. A retailer sought to restrain this anticompeti-

tive activity. The Court noted that state authorization, approval, acquiescence or encouragement in restrictive private conduct confers no antitrust immunity. It held that the regulated utility had sufficient freedom in deciding to initiate the lamp-exchange program to be held responsible under applicable federal law for its conduct. *Id.* at 594, 96 S.Ct. at 3119. Only where, the Court continued, the state participation in adopting and implementing an anticompetitive plan is "dominant" would it be unfair to hold such private party responsible. *Id.* at 594–95, 96 S.Ct. at 3119. In *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), *Cantor* was distinguished in a suit involving an Arizona Supreme Court disciplinary rule restricting lawyers' advertising. The Court in *Bates* held that the State had not merely acquiesced in the unlawful program; rather the supreme court had adopted, supervised, and enforced its disciplinary rules and thereby acted as sovereign. It was deemed "significant" that the "state policy [was] so clearly and affirmatively expressed and that the State's supervision [was] so active." *Id.* at 362, 97 S.Ct. at 2698.

The next issue posed was whether a municipality could ever act as sovereign. In *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court said that cities are not themselves sovereign except insofar as the municipality acts as an instrumentality of the state by engaging in an act "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. Such a state policy was then identified in *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), where the State of California's Automobile Franchise Act's regulatory scheme—"clearly articulated and affirmatively expressed"—was designed to display open business competition in the establishment and relocation of auto dealerships. The Supreme Court held that this regulatory program was outside the reach of federal antitrust laws under the state

action exemption. *Id.* at 109, 99 S.Ct. at 411.

The tests that by 1980 had emerged from the cited cases were set forth in *California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In that case the State of California enacted a resale price maintenance and price posting statute for the wholesale wine trade. The Court stated that its decisions established two criteria for antitrust immunity under *Parker v. Brown.* "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *Id.* at 105, 100 S.Ct. at 943. The wine resale price maintenance law met the first test because legislative policy was so clearly and forthrightly set forth. But, the Court concluded, the State simply *authorized* price setting and enforced prices that had been established by private parties, without itself establishing or reviewing those prices for reasonableness. It could not be said that the State actively supervised the program and without such supervision, the State would merely be immunizing those who violate the Sherman Act by authorizing them to violate it. Thus, the plan failed the second test and was subject to the antitrust laws. *Id.* at 105–06, 100 S.Ct. at 943.

In *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Court returned to the question of whether a municipality was entitled to claim the state action defense. In that case the City of Boulder, pursuant to state delegated "home rule" powers, attempted to regulate cable television service within its city limits. The High Court held that a state may choose to effect its policies through the instrumentality of one or more of its cities so long as the state's policy is "clearly articulated and affirmatively expressed." *Id.* at 51, 102 S.Ct. at 840. But there no state immunity was available because the State of Colorado had taken a neutral stance respecting the challenged anti-competitive activities of

the City of Boulder. It neither expressly endorsed nor compelled the municipality's actions. *Id.* at 55, 102 S.Ct. at 842.

Finally, a trio of cases decided in the last two years further refines the rules of the earlier decisions. In *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984), the Court stated that when the anticompetitive conduct is undertaken by the sovereign itself, for example, through its legislature or its supreme court, that activity is *ipso facto* immune from federal antitrust laws. No further inquiry need be made. *Id.* at 1995. But when the same activity is carried out by private parties pursuant to state authorization, the two part *Midcal* test must be vigorously applied to ensure that the conduct was contemplated by the state. *Id.* at 1995–96. Most important for our purposes perhaps is *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24. There the City of Eau Claire, Wisconsin, was named in a Sherman Act suit that alleged it had acquired a monopoly over sewage treatment services, and had tied the delivery of those services to its providing sewage collection and transportation services. The Court noted that this case presented a situation where the municipality's anticompetitive activities were authorized, but not compelled, by the State, which did not actively supervise them. It held that the test's first prong—a "clearly articulated and affirmatively expressed" state policy—was met because the statute plainly showed that "the legislature contemplated the kind of acts complained of." *Id.* at 1719 (*quoting Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138). The Court thus indicated the test should be one of foreseeability—whether the legislature could foresee the anticompetitive effects that would follow from the express authority the state had delegated to its cities. *Id.* at 1718–19. But significantly, for the first time, the Supreme Court held that, unlike a private party, a municipality need not satisfy the second *Midcal* prong by showing that its anticompetitive conduct was actively supervised by the state. Absent a contrary showing, a municipality presumptively acts

in the public interest. A private party, on the other hand, may be presumed to be acting on its own behalf, rather than to be furthering the governmental interests of the state. *Id.* at 1720.

The most recent case, *Southern Motor Carriers Rate Conference v. United States,* —— U.S. ——, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), considered authorized, but not compelled, collective ratemaking by common carriers in four southern states. Setting forth *Midcai*'s two-part test, the Court instructed that antitrust laws do not forbid the state from adopting policies that permit anticompetitive conduct by regulated private parties. "As long as the State clearly articulates its intent to adopt a permissive policy, the first prong of the *Midcal* test is satisfied." *Id.* at 1728. The Court appears to have eliminated the compulsion test of *Goldfarb* in holding that compulsion is not a prerequisite to a finding of state action immunity. *Id.* at 1728–29. The second prong of the *Midcal* test was conceded. *Id.* at 1731.

### 2. *Rules of State Action Defense Summarized*

■ From the foregoing recitation, the governing rules may be summarized. (1) When a state acts in its sovereign capacity, its actions are immune from federal antitrust scrutiny. *Parker*, 317 U.S. at 351–52, 63 S.Ct. at 313–14; *see* Areeda, *Antitrust Immunity, supra*, at 436–37. State legislatures and courts are accorded such status. *See Hoover*, 104 S.Ct. at 1996–98 (adjunct committee to state supreme court); *Bates*, 433 U.S. at 359–63, 97 S.Ct. at 2696–98 (state's highest court when exercising its judicial authority acts as the state); *Parker*, 317 U.S. at 351–52, 63 S.Ct. at 313–14 (state legislature).

■ (2) Although municipalities are state subdivisions, they do not enjoy the deference due a state as sovereign and cannot create their own policies. A municipality will be immune from antitrust liability only if it acts as an instrumentality of the state, through which the state has

clearly and affirmatively chosen to implement its policies. *Community Communications Co.*, 455 U.S. at 52–54, 102 S.Ct. at 841–42; *Lafayette*, 435 U.S. at 411–13, 98 S.Ct. at 1136–37. (3) When a state agency, municipality, or other state subdivision claims a state immunity from federal law, it must first identify a "clearly expressed state policy" that authorizes its actions. *Hallie*, 105 S.Ct. at 1717. The clarity of such policy is often a function of how broadly the legislation is drawn, with the existence of such policy being more readily discernible in narrowly drawn legislation. The legislation must contain an affirmative showing of intent, though it need do no more than authorize the challenged conduct. *Southern Motor Carriers*, 105 S.Ct. at 1729.

■■■■ (4) So long as the resulting anticompetitive activities are a foreseeable consequence of the state delegation, the "clear articulation" standard has been met. *Hallie*, 105 S.Ct. at 1718–19. To meet this requirement the party claiming the state action defense must show that the "legislature contemplated the action complained of." *Id.* (*quoting Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138). (5) The second requirement—"active state supervision"—is no longer required in the case of a municipality, because a municipality, unlike a private party, has no incentive to act other than in the public interest. *Hallie*, 105 S.Ct. at 1720. When the challenged actor is a private party, both foreseeability and supervision must be demonstrated. *Southern Motor Carriers*, 105 S.Ct. at 1729.

C. *Defining the Scope of the Delegation*

Difficulty arises in defining the actual scope of the delegation. Several of the cases just discussed illustrate the distinctions drawn. In *Community Communications Co.*, the Supreme Court held that Colorado's home rule statute did not provide specific authorization for city regulation of cable television services. As a municipality with home rule powers, Boulder could exercise " 'the full right of self-government in both local and municipal

matters. . . .' " 455 U.S. at 43, 102 S.Ct. at 837. The Court found this left the State of Colorado in a "neutral" stance with regard to local cable television regulation. *Id.* at 55, 102 S.Ct. at 843. In sum, the State of Colorado simply had no articulated policy regulating Cable TV.

In *Hallie*, the City of Eau Claire had a monopoly over sewage treatment and tied the use of treatment to its collection service by insisting that users of the treatment plant contract for city collection services. 105 S.Ct. at 1715–16. The city cited statutory authority allowing it to choose whether to service an area and to determine the types of services that it would provide. *Id.* at 1718. There was also general authority to build and maintain sewer systems. *Id.* at 1717–18. Examining these statutes, the Supreme Court noted that an additional, explicit legislative grant to exercise monopoly power through tying arrangements was unnecessary, because consistent with the powers conferred, "it is clear that anticompetitive effects logically would result from this broad authority to regulate." *Id.* at 1718. Broad legislative authority to regulate in the specific area of sewage treatment, the Court said, foreseeably results in the City properly exercising anticompetitive power over the collection and transportation of sewage.

Similarly in *New Motor Vehicle Bd.*, the state agency was empowered to determine where car dealerships would be placed without specific direction to locate them in an anticompetitive manner. Despite this, the Court upheld the application of the state action defense, observing that anticompetitive effects were foreseeable. 439 U.S. at 109, 99 S.Ct. at 411.

■■■ Distilling from these cases the rule defining the scope of the delegation, we conclude that the enabling legislation need not explicitly authorize the exact actions undertaken. It is only necessary that the permitted actions produce anticompetitive consequences that foreseeably flow from the grant of state authority. That is, the enabling statute must affirmatively designate a particular area to be regulated, pro-

vide the methods of regulation, and create grounds for a reasoned belief that some anticompetitive activity could be envisioned. Moreover, the state must be an active participant in the decision-making process and not merely ratify anticompetitive actions taken by private actors.

Having established the analytic framework for discussion we turn to the specific facts of the instant case. Before we can determine whether the UDC and the private appellees are entitled to the state action defense, we must address two questions. First, whether the actions of the UDC were those of the state in its sovereign capacity thereby automatically invoking the state action defense, or, if not, whether there was a clearly articulated state policy authorizing the UDC's actions and the attendant anticompetitive results; and second, whether active state supervision over those actions had to be demonstrated. We examine each question in turn.

### III   Is the UDC the State?

The district court found that the UDC was not the state. We agree. Although the UDC is a creature of statutory origin and exercises governmental power arising from its designation as a corporate governmental entity, it cannot claim that it is the state simply because of its status. *Lafayette*, 435 U.S. at 408, 98 S.Ct. at 1134. Rather, the UDC must show that all of its actions were directed by the State of New York. *Goldfarb*, 421 U.S. at 792, 95 S.Ct. at 2015. For example, in *Hoover*, bar examinations were graded by an adjunct committee to the state supreme court. 104 S.Ct. at 1991–95. The court created the committee, it selected the subjects to be tested, and permitted direct appeals by unsuccessful applicants. This high degree of state involvement signalled that the activities of the committee were those of the court and consequently those of the state. *Id.* at 1996–98.

Here, that high level of participation by the state is missing and thus militates against finding that the UDC was acting in a sovereign capacity. Moreover, the state legislature went to great lengths to secure significant independence for the UDC. New York courts have recognized that though this public benefit corporation performs a role essentially governmental in nature, it is not "identical with the State itself." *Smith v. Levitt*, 37 A.D.2d at 421, 326 N.Y.S.2d 335. Thus, we cannot conclude that the UDC was acting in a sovereign capacity.

### IV   UDC's Claim to the State Action Defense

#### A.   *Clearly Articulated State Policy*

Because the UDC is not the sovereign, it must show that its anticompetitive conduct was pursuant to a clearly articulated state regulatory policy before a state action defense will be available. In our view it has made this showing.

Looking first to its general powers, we note that the UDC is granted broad powers to improve the urban environment.[3] It was established and structured to be free of the typical political forces that strangle urban development efforts. Working with local oficials and private investors, the UDC was to select sites for rejuvenation; structure financial packages to make the projects attractive to the private sector; and take other steps necessary to building or maintaining the State's local cultural, educational, and residential facilities. Underlying the Act was a belief that the private sector alone was incapable of attracting sufficient capital funds for the redevelopment task. Therefore, the State used the UDC as a vehicle to attract private capital. Private parties were to be urban redevelopers and

---

**3.** Its predecessor, the Housing Finance Agency, one of several agencies created under the Private Housing Finance Law, N.Y.Priv.Hous. Fin.L. §§ 40–61 (McKinney 1976 & Supp.1986), had powers that were too limited to undertake the high-risk social engineering projects envisioned for the UDC. In order to strike directly at physical deterioration, economic stagnation, unemployment, and shortages of housing and civic facilities—which are the roots of urban decay—the State Legislature devised a variation of the public authority theme and built into the UDC nearly absolute operational autonomy. Osborn, *New York's UDC* at 238 n. 5 (1977).

the UDC was to serve as organizer and referee between competing private interests. This state policy is set forth in UDC Act § 6252 which provides:

> It is further declared to be the policy of the state to promote the safety, health, morals and welfare of the people of the state and to promote the sound growth and development of our municipalities through the correction of such substandard ... characteristics by the clearance, replanning, reconstruction, redevelopment, rehabilitation, restoration or conservation of such areas, and of areas reasonably accessible thereto the undertaking of public and private improvement programs related thereto, including the provision of educational, recreational and cultural facilities, and the encouragement of participation in these programs by private enterprise.

Under the specific powers of the corporation set forth in UDC Act § 6255 (of which 28 are now enumerated) subdivision 7 is perhaps the most significant. It grants the UDC the power:

> To acquire or contract to acquire from any person, firm, corporation, municipality, federal or state agency, by grant, purchase, condemnation or otherwise, leaseholds, real, personal or mixed property or any interest therein; to own, hold, clear, improve and rehabilitate, and to sell, assign, exchange, transfer, convey, lease, mortgage, or otherwise dispose of or encumber the same.

These and other specific powers show that the legislature envisioned the UDC would lease property in an anticompetitive manner. For example, it was specifically empowered to acquire property for use as cultural sites, and authorized to lease this property to any third party, directly or through a subsidiary. The leasing power, at issue here, is further articulated in § 6256(1) which grants the UDC power to enter into a 99-year lease with any third party when the land is to be used for a land use development project. Further, competitive bidding is not mandated. *See id.* That is, the UDC could consider factors other than price in selecting a site developer.[4] Public notice was required only in specific circumstances, not here relevant. The only limitations on a land use improvement project—noted earlier in the facts— are that the UDC must first find that the proposed project will actually improve a blighted area and then make three corollary findings and state the basis for them pursuant to § 6260(c) and (f). It can be seen that none of the specific limitations placed on the UDC's power to lease real estate for land use improvement projects mentions that the leases must be awarded in such a manner that market competition is maintained.

### B. *UDC's Activities in Accordance with Its Powers*

■ The UDC has acted in accordance with these powers. It acquired property for land use improvement projects. In

---

**4.** The district court placed great significance on the legislature's decision to leave to the UDC the decision of whether or not to employ competitive bidding. Competitive bidding only dictates that the leases be awarded to the competitor who best meets the scoring criteria. Usually price is a pivotal factor. The competitive nature of the bidding is only in regard to the project and does not generally contemplate considerations of market competitiveness unless specifically contained in the contest's guidelines. So by itself the use of competitive bidding does not mean that antitrust compliance was contemplated. Rather, one can as easily argue that in giving the UDC the authority to determine the criteria by which the leases were to be awarded, whether pursuant to competitive bidding or not, the legislature clearly envisioned that the UDC

could choose to place other values ahead of antitrust compliance and award the leases in an anticompetitive manner. For example the UDC could base the award solely on price and the highest bidder would win even if that lessee already possessed a large market share. Or the UDC could decide that cultural or political considerations mandate selecting a lessee who otherwise might be precluded from winning by the applicable antitrust statutes. By itself then the use of competitive bidding is not significant; what is, is the legislature's decision to allow the UDC to dictate the criteria for the bidding. Similarly, the legislature's decision to allow the UDC to award leases without any public notice or bidding reasonably contemplates that the leases will be awarded in an anticompetitive manner.

close cooperation with local city officials, it conducted competitive bidding and leased these properties to private parties. These actions were part of a large-scale urban development project—just the context that the legislature envisioned. Further, the legislature affirmatively aimed to have the UDC determine the distribution of cultural facilities within a selected development site. In this respect, the instant case is similar to *New Motor Vehicle Bd.*, where the state agency selected the location of automobile franchises. There, the power to distribute anticompetitively was viewed as a foreseeable result of the general power to distribute. Here, the UDC is given the power to distribute redevelopment sites throughout the State, and to distribute cultural facilities within each site. That anticompetitive consequences might result from the power to distribute not only the sites but the placement of the facilities within each site is foreseeable. Moreover, New York's enabling statute clearly articulates the area to be regulated, the manner of regulation, and puts limits on its public corporation's powers. Thus, there exists here a clearly articulated state policy.

## V Anticompetitive Effects in Broadway Theater Area—a Secondary Market—Were Foreseeable

Appellants concede that the legislature contemplated that the UDC would regulate the awarding of leases for land use development projects in the development zones. But they allege that the legislature did not envision that in so regulating, the UDC would produce anticompetitive effects in another market, that is, the Broadway Theater market.

### A. Misplaced Reliance on *Cantor*

Appellants rely on *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141, *supra,* to support their argument. In *Cantor*, as noted, state regulations applied only to the distribution of electric power, not to the distribution of light bulbs. *Id.* at 584, 96 S.Ct. at 3114. Without an affirmative statement, the stat-

ute's silence on this subject was considered neutral on whether or not the utility should have such a program. *Id.* at 584–85, 96 S.Ct. at 3114–15. Because the decision to provide light bulbs was made by a private party, responsibility for the anticompetitive activity rested with it. *Id.* at 593–94, 96 S.Ct. at 3114. Thus, appellants urge, authority by the state to regulate one market did not translate into a grant of power to a private party to engage in anticompetitive activity in another secondary market.

*Cantor* does not provide as strong support for the appellants as they believe. In *Cantor*, the party seeking protection from the antitrust laws was a provider of electric power. No state policy affirmatively expressed an intent that the utility market light bulbs. Significantly, the Supreme Court did not hold that simply because the utility's activities were outside the scope of its regulated business, the light bulb program could never be shielded from antitrust scrutiny. Rather, the Court held that there was no state authorization for the subject activity. The light bulb market was completely separate from the business of providing electric power, so the right to monopolize one could not, without a clearly articulated state policy, transfer to the other. Translated to the language of today's cases, the actions of the utility were neither authorized nor *foreseeable*. Yet, the possibility that actions in secondary markets might still be immune was not foreclosed.

### B. *Foreseeability of Anticompetitive Activity in Broadway Theater Market*

■ This case is different. The UDC was created specifically to devise redevelopment zones. The primary thrust of the UDC regulation was not the Broadway Theater industry but the area encompassed within the Project's boundaries. When an agency acting under clearly articulated state policy brings about foreseeable anticompetitive effects in a secondary market, that state action is not preempted by the antitrust laws.

When the state allows for the creation of model cities and urban redevelopment zones, a reasonable consequence of such redevelopment is that decisions internal to the zones will have effects outside them. It is anticipated that when one section is improved, the entire area surrounding it also will improve. It is precisely in that fashion that urban decay is reversed. It is fair to conclude that the legislature contemplated that when it granted power to the UDC to determine what buildings and services would be provided in a particular redeveloped land use project, it knew those choices would affect businesses and residences in that entire area. Such a conclusion is based on common sense. As a result of cultural improvements, rents and property values would increase even though some competitors would be adversely impacted, and some would disappear. So long as the state agency meets the state action test regarding the primary area of regulation and the effects in the secondary market are reasonably foreseeable, federal antitrust law does not prohibit the state action.

The UDC's powers are broad enough so that the state legislature in choosing this vehicle to construct urban projects and granting it power to acquire property and lease it for cultural and residential purposes surely contemplated, for example, that the UDC could engage in anticompetitive activities affecting the residential real estate market. We see nothing to distinguish the Broadway Theater district as a cultural market from the UDC's unchallenged powers in the real estate market. The instant situation is unlike *City of Boulder* where the municipality was free to decide every policy aspect of cable TV regulation. That is to say, under the Home Rule law, the City of Boulder had unfettered authority in a matter of local concern. In contrast, in *Town of Hallie*, the municipality was authorized to treat sewage *pursuant to a specific state law*. Within that area of local concern the municipality could act anticompetitively even though the authorizing legislation did not explicitly anticipate the challenged anticompetitive conduct.

The distinction is plain. In the former case, the municipality had unlimited power to regulate matters of local concern, of which cable TV was one. In this area, the state had expressed no policy. In the latter case, the municipality also acted to displace competition by regulating a field of local concern, but a state statute expressly authorized municipal activity in that area. Applying this distinction to the instant case, we conclude that the UDC's anticompetitive activities in the urban land use development project are authorized by a clearly articulated state policy in this particular area. Consequently, the challenged anticompetitive consequences in the Broadway Theater market, another market, are also entitled under the state action defense to be free from federal antitrust laws.

Finally, the UDC need not satisfy the active state supervision prong of the *Midcal* test. 445 U.S. at 105, 100 S.Ct. at 943. When the actor is a municipality, the active state supervision requirement is abandoned because a municipality has no incentive to act in any other than the public interest. *Hallie*, 105 S.Ct. at 1720–21. The UDC, like a municipality, is by statute a political subdivision of the state. UDC Act § 6254(1). Therefore its interests must be defined as public rather than private, and consequently, the active state supervision requirement is unnecessary. Such a holding was presaged by *Hallie*, where the Supreme Court indicated that it was "likely" that state agencies would not have to demonstrate active state supervision. 105 S.Ct. at 1720 n. 10.

### C. *The Municipality's and Private Parties' Claims*

Having found that the UDC and Times Square Redevelopment Corporation are entitled to claim the state action defense, we consider next the City of New York's argument that it too is entitled to the same immunity. Ordinarily, a municipality must show that it acted pursuant to a clearly expressed state policy and that

the resulting antitrust consequences were reasonably contemplated by the state, *Hallie*, 105 S.Ct. at 1717, the same standard as that applied to the UDC. *See also Fisher v. City of Berkeley*, — U.S. —, 106 S.Ct. 1045, 1051–52, 89 L.Ed.2d 206 (1986) (Powell, J., concurring) (citing *Hallie* standard); *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 95–96 (2d Cir.1986) (citing *Hallie*). But New York City does not have to make this showing when it is acting in concert with a state agency whose actions are already protected by the state action defense. Since the UDC's actions are shielded from antitrust law violations, it would defeat the purpose of the defense were we to allow appellants to prevent the award designations simply by suing New York City rather than the Agency. *See Southern Motor Carriers*, 105 S.Ct. at 1726–27. Because the UDC and its subsidiary had the authority to conduct the challenged sales and award the leases in an anticompetitive manner, the City's participation in those sales, which is recognized and affirmatively encouraged in the UDC's enabling legislation, is also protected.

■ For the same reasons, the private appellees acting in concert with the UDC are also entitled to state immunity. This participation was actively encouraged by the legislature. In fact, one of the fundamental goals of the Act was to have the UDC attract private investors and developers. When the UDC accomplishes its goal in a protected manner, and the participation of private third parties was reasonably contemplated by the legislature, allowing successful tangential attacks on the UDC's activities through suits against the third parties would effectively block the efforts of the UDC.

## VI Conclusion

In sum, the State was confronted with a difficult problem. To deal with it, the legislature created the UDC, and authorized it to conduct the lease sales challenged here. Any antitrust violations—whether within the bounds of the Project or in markets secondarily affected by activities within the Project—arising from these sales were foreseeable consequences of a clearly articulated state policy. The City of New York and the private appellees were actively encouraged to participate in carrying out the State's plans and hence are also entitled to claim the state action defense. With the dismissal of the federal claims, jurisdiction over the pendent state claims is lacking.

The judgment appealed from is affirmed.

JON O. NEWMAN, Circuit Judge, concurring:

I concur in Judge Cardamone's comprehensive opinion for the Court but add a few words to identify a difficulty this case presents in the application of the state action defense to antitrust liability. As the Supreme Court has instructed, the critical inquiry when considering acts that cannot be regarded as those of a state in its sovereign capacity is whether the challenged anticompetitive action has been taken pursuant to a state policy to displace competition with regulation. *See Town of Hallie v. City of Eau Claire*, 105 S.Ct. 1713, 1716 (1985); *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.). The Court has not insisted that the precise anticompetitive conduct at issue be expressly authorized by state statute. Instead, the Court has been willing to attribute the requisite policy to the state whenever the anticompetitive conduct at issue is a reasonably foreseeable consequence of action that has been expressly authorized. However, the Court has been more willing to deem anticompetitive conduct to be a foreseeable consequence of authorized action when the authorization concerns a narrowly defined range of activity. For example, anticompetitive conduct of tying sewage collection service to sewage treatment service was deemed to be a foreseeable result of narrow statutory authority permitting a town to construct a sewage treatment plant and to refuse to serve unannexed areas. *Town of Hallie v. City of Eau Claire, supra.* On the other hand, the breadth of home

rule legislation precluded a determination that anticompetitive conduct in the field of cable TV was a foreseeable consequence of the authorizing statute. *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982).

In this case, we consider a statute of extraordinary breadth. The UDC Act is virtually a charter of governmental authority. Indeed, the activities of the UDC involve a breadth and dollar volume of transactions greater than those undertaken by many states. The UDC's mandate to improve the urban environment throughout New York State and the accompanying range of delegated powers obviously constitute a more expansive grant of authority than the City of Eau Claire's power to construct a sewage treatment plant. To speak of any particular anticompetitive conduct as being "foreseeable" in the exercise of the UDC's broad powers is to mean something rather different than the prospect that sewage collection service would be provided only to those purchasing Eau Claire's sewage treatment service. Though it was foreseeable, even inevitable, as Judge Cardamone points out, that the UDC's authority to determine what will be built and who will build in certain areas would produce effects upon business and residences in such areas, it is far less clear that the legislators authorizing the UDC's broad powers foresaw that the agency would risk undue concentration of market power by placing theater properties in the hands of the three dominant owners of Broadway theaters. Surely further enhancement of their considerable market power is not the only way or even one of the more likely ways a legislature might have expected the UDC to upgrade the quality of life in the Times Square area.

I find the issue of foreseeability to be a close question in this case. I am inclined to resolve it in favor of the state action defense, as Judge Cardamone's opinion does, because I believe that the inquiry as to foreseeability ought to take into account two variables—not only the scope of the statutory authority but also, and perhaps more important, the proximity of the defendant's actions to the sovereign authority of the state. Though the breadth of the UDC's charter makes the foreseeability link rather attenuated, the very nature of the UDC as a virtual ministate cuts the other way, enhancing the appropriateness of recognizing the state action defense. If the range of powers granted to the UDC were granted to a municipal or county agency, operating within a limited geographic area, the state action defense should not insulate the assigning of properties in a manner that would otherwise violate section 7 of the Clayton Act. Yet if the action were taken by New York State itself, the defense would be applicable. Whether a state will really monitor the anticompetitive effects of its actions and tolerate them only to the extent necessary to achieve state objectives will always be a matter of some speculation. But the premise of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed.2d 315 (1943), is that federal courts, in applying the antitrust laws, should assume that Congress accepted the risks of state-authorized displacement of competition. The rationale of that decision persuades me to apply the foreseeability component of the state action defense generously where, as here, the defendant agency, though not technically exercising the sovereign authority of the state, had been accorded statelike powers. Whatever faith Congress has in the ability of a state to monitor anticompetitive consequences of its actions might as well be extended to an agency like the UDC.