899 F.2d 474
 58 USLW 2573, 1990-1 Trade Cases 68,966,
16 Fed.R.Serv.3d 38
 RIVERVIEW INVESTMENTS, INC. and Melvin F. Smith,
Plaintiffs-Appellants and Cross-Appellees,
v.
OTTAWA COMMUNITY IMPROVEMENT CORPORATION, Village of Ottawa,
Charles Bruskotter, James Beckman, Richard Edelbrock, Thomas
Doepker, David Laudick, Richard Laudick, Louis Macke,
Defendants-Appellees and Cross-Appellants.
 Nos. 88-3381, 88-3399.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 14, 1989.
Decided March 27, 1990.
Rehearing and Rehearing En Banc Denied May 10, 1990.
 
 Ronald S. Moening, Robison, Curphey & O'Connell, Toledo, Ohio, Andrew S. Lipton (argued), Robert E. Manley, Manley, Burke & Fischer, Cincinnati, Ohio, for plaintiffs-appellants cross-appellees.
 David M. Schnorf, Jeffrey A. France, Schnorf & Schnorf, Toledo, Ohio, Michael E. O'Malley, George E. Schroeder, Schroeder, Schroeder & O'Malley, Ottawa, Ohio, Kelly D. Stimpson, Toledo, Ohio, G. Jack Donson (argued), Susan E. Wheatley, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendants-appellees cross-appellants.
 Before MERRITT, Chief Judge; KENNEDY, Circuit Judge; and McRAE, Senior District Judge.*
 KENNEDY, Circuit Judge.
 
 
 1
 Riverview Investments, Inc. and its president Melvin Smith appeal the District Court's grant of judgment notwithstanding the verdict ("judgment n.o.v.") in this antitrust action. Following a jury trial, appellants were awarded $350,000, which was trebled to $1,050,000 pursuant to 15 U.S.C. Sec. 15. The District Court granted appellees' motion for a judgment n.o.v. on the grounds that appellants presented insufficient evidence for the jury to find an agreement in furtherance of a conspiracy. The court alternatively granted appellees' motion for a new trial. Appellants appeal both of these rulings. Appellees also cross-appeal other various rulings of the court. We find that the District Court did not err in granting appellees' motion for judgment n.o.v. and therefore AFFIRM.
 
 
 2
 Ottawa Community Improvement Corporation ("CIC") and its members are a nonprofit corporation contractually responsible for reviewing requests for industrial revenue bonds ("I.R.B.'s") on behalf of the Village of Ottawa. Ohio Rev.Code Ann. Sec. 1724.10. CIC has the responsibility of evaluating requests for I.R.B.'s using specific criteria, and I.R.B.'s may not be issued without CIC approval. Appellant Smith is president and sole shareholder of Riverview Investments, Inc., which is a real estate development corporation. Riverview bought over twelve acres of land outside the Village in 1979, part of which was to be developed with the I.R.B.'s that are involved in this appeal.
 
 
 3
 Appellants entered into an agreement with Chase Shopping Centers, Inc., whereby Chase had the option of purchasing over ten acres of appellants' property to build a shopping center, including a K Mart store. Chase would only purchase the property if CIC approved the sale of I.R.B.'s. A financing firm, Zappalla & Company, Inc., committed itself to purchase up to $1,950,000 in I.R.B.'s once they were issued.
 
 
 4
 Appellee CIC voted to deny appellants' bond request on April 16, 1980. CIC reconsidered appellants' request on August 8, 1980, but again rejected it. CIC gave no reason for the denial on either occasion. Failing to get bond approval, the agreement between appellants and Chase was dissolved.
 
 
 5
 Appellants sued CIC and its members in December, 1981, claiming that appellees violated 42 U.S.C. Sec. 1983 and 15 U.S.C. Secs. 1, 2 (Sherman Act).[1] The suit was dismissed on summary judgment, and appellants appealed. This Court affirmed summary judgment on the section 1983 claim, but reversed summary judgment on the antitrust claim. Riverview Investments, Inc. v. Ottawa Community Improvement Corp., 769 F.2d 324 (6th Cir.), as amended, 774 F.2d 162 (6th Cir.1985).[2] It ruled that appellees may be entitled to state immunity under Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). Hallie gives state immunity if the challenged conduct is done pursuant to a clear state policy to displace competition, and if the state supervises the conduct. This Court found that the first prong of Hallie was satisfied, but remanded for the District Court to consider the second prong. The District Court found that CIC was a "private non-municipal party" subject to Hallie 's second prong, that its decision in effect denied appellants' I.R.B. application, and that the state did not supervise its decision. The case was tried, appellants claiming that appellees' votes to deny the I.R.B. application amounted to a conspiracy in unreasonable restraint of trade.
 
 
 6
 Appellees moved for judgment n.o.v. or, alternatively, a new trial. The motion for judgment n.o.v. was granted on the grounds that appellants presented insufficient evidence from which the jury could infer appellees entered into a conspiracy. The court also conditionally granted a new trial on the grounds that the verdict was against the weight of the evidence. Appellants appeal the judgment n.o.v. and new trial ruling. Appellees also cross-appeal the District Court's finding that they were not entitled to state immunity.
 
 A. Renewal of Rule 50(b) Motion
 
 7
 Appellants first argue that appellees' motion for judgment n.o.v. was improperly granted because appellees failed to preserve it by renewing their motion for a directed verdict at the close of all the evidence. Appellees made a motion for directed verdict after the close of appellants' case-in-chief and again at the close of their own case-in-chief, claiming that appellants failed to put on sufficient evidence from which the jury could find a conspiracy. However, appellants put on a rebuttal witness. Appellees failed to renew their motion for a directed verdict after his testimony, which constituted the end of all the evidence. It is upon this failure to renew that appellants claim appellees waived their right to make a motion for judgment n.o.v.
 
 
 8
 As a general rule, a party seeking a judgment n.o.v. must, as a prerequisite, move for a directed verdict at the close of all the evidence or renew such motion if made prior to the close of all the evidence. Fed.R.Civ.P. 50(b). This Court has recently ruled, however, that technical deviation from Rule 50(b)'s command is not fatal. Boynton v. TRW, Inc., 858 F.2d 1178 (6th Cir.1988) noted that "[w]hile '[i]t is certainly the better and safer practice to renew the motion for directed verdict at the close of all the evidence,'
 
 
 9
 [t]he application of Rule 50(b) in any case 'should be examined in the light of the accomplishment of [its] particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for truth.' "
 
 
 10
 Id. at 1185 (quoting Bonner v. Coughlin, 657 F.2d 931, 939 (7th Cir.1981)). This Court in Boynton further adopted the Fifth Circuit's conclusion that slavish application of the rule would be "to succumb to a nominalism and a rigid trial scenario as equally at variance as ambush with the spirit of our rules." Id. at 1186 (quoting Bohrer v. Hanes Corp., 715 F.2d 213, 216 (5th Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984)). In avoiding adherence to "slavish nominalism," this Court cited with approval 5A Moore's Federal Practice Digest Sec. 50.08 (2d ed. 1984), which says that
 
 
 11
 a motion for judgment notwithstanding may be granted despite the party's failure to renew his motion for a directed verdict where: (1) The court indicated that the renewal of the motion would not be necessary to preserve the party's rights; and (2) The evidence following the party's unrenewed motion for a directed verdict was brief and inconsequential.
 
 
 12
 858 F.2d at 1186. This is in accord with other circuits which have held that upon a movant's failure to renew its motion for a directed verdict at the close of all the evidence, judgment n.o.v. may still be granted "if the evidence introduced after the motion for directed verdict was brief, and the court somehow indicated that renewal of the motion would not be necessary...." Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 294 (8th Cir.1982), cert. denied, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); see also Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 825-26 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979).
 
 
 13
 In Boynton, the defendant made a motion for a directed verdict at the end of the plaintiff's case-in-chief. He failed to renew the motion at the end of all the evidence. After the jury returned its verdict, he moved for a directed verdict, which was denied. On appeal, this Court held that the defendant's motion for a directed verdict was in effect a motion for judgment n.o.v., and that the failure to renew the motion at the close of the defendant's evidence did not constitute a waiver of his right to move for judgment n.o.v. The Court relied on the fact that the judge indicated, upon defendant's motion for a directed verdict at the close of plaintiff's case, that he intended to let the case go to the jury. The Court also noted that defendant's evidence consisted of the testimony of one person, most of which was duplicative of plaintiff's witnesses. Renewing the motion at the close of all the evidence would therefore serve no useful purpose. 858 F.2d at 1186.
 
 
 14
 In the present appeal, appellees contend that the District Court indicated to them that the technical requirements of Rule 50(b) were met.[3] This contention is underscored by the District Court's explicit finding that it informed appellees that renewal of their motion for directed verdict would not be necessary to comply with the requirements of Rule 50(b). Moreover, the District Court also found that the testimony obtained by appellants after the motion for a directed verdict was brief. Appellants' rebuttal evidence consisted of Mr. Smith's testimony regarding the identities of the borrower and the obliger involved in the transaction, the effects the rejection of I.R.B.'s had on appellants' business, and other minor issues. We agree that this testimony was brief and of little consequence to the outcome of the trial.
 
 
 15
 We conclude that because the District Court indicated to appellees that renewal of their motion for a directed verdict was not necessary to preserve their right to move for judgment n.o.v., and because Smith's rebuttal testimony was brief and inconsequential, appellees' failure to renew its motion for a directed verdict at the end of the rebuttal testimony did not preclude the District Court from granting judgment n.o.v.
 
 B. State Action Immunity
 
 16
 Before considering the propriety of granting judgment n.o.v., we must consider appellees' state action immunity defense. CIC's defense, raised by way of its cross-appeal, is that it is entitled to immunity under Hallie, 471 U.S. at 34, 105 S.Ct. at 1714 because of its status as a public entity. Hallie grants state action immunity from Sherman Act liability if either (1) the entity performing the alleged conduct in restraint of trade is private, but supervised by the state, or (2) if it is a municipality or agent of a municipality. See Consolidated Television Cable Serv. Inc. v. City of Frankfort, 857 F.2d 354 (6th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989). In a previous appeal in the present suit, this Court remanded to the District Court for a determination of:
 
 
 17
 (1) Whether the Village of Ottawa or the Ottawa Community Improvement Corporation made the effective decision to reject appellants' bond application. If the District Judge concludes that the Village of Ottawa did, the order denying relief should be reentered. (2) If the District Judge determines that the Community Improvement Corporation made the effective decision, then evidence should be taken on whether in rendering its decision the Community Improvement Corporation was actively supervised by the state.
 
 
 18
 Riverview Investments, 769 F.2d at 330. Upon remand, the District Court found that "CIC was not considered by the State as a municipality or agency of a municipality, but simply as a body of people organized for the purpose of economic development." It also found that CIC was "separate from the Village and [was] not a government body." The court concluded as a matter of law that "CIC [was] a private, non-municipal party," and its decision denying appellants' application was not supervised by the state.
 
 
 19
 In its cross-appeal, appellees challenge these conclusions, claiming that the court should have found that CIC was a municipal agent entitled to state immunity. Upon review of the record and consideration of the relevant precedents, we agree with the District Court.
 
 
 20
 Hallie held that a municipality is subject to state action immunity if it acts pursuant to a clearly articulated state policy, regardless of whether its actions are supervised by the state. If the actor is private, however, active state supervision is necessary to claim immunity. This is so because
 
 
 21
 [w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. When the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement.
 
 
 22
 471 U.S. at 47, 105 S.Ct. at 1720 (emphasis in original). Appellees claim that the District Court erred in determining that CIC was a private entity and cite several cases to support this position. However, each case is distinguishable from the facts of this appeal. In Consolidated TV, this Court held as a matter of law that Community Services, Inc., a non-profit, non-stock corporation, was a public entity. In Consolidated TV, Community Services was created by the Electric and Water Plant Board of the City of Frankfort, Kentucky to operate, pursuant to a contract between Community Services and the board, a cable TV network owned by the City. Consolidated TV sought the Board's permission to extend its cable service into areas served by Community Services. It was denied three times, and Consolidated sued under section 1 of the Sherman Act.
 
 
 23
 This Court found in favor of Consolidated's claim of state action immunity, relying on the undisputed facts that (1) the Board (and by extension, the municipality) created Community Services, (2) Community Services' structure and operation was determined by the City through the Board, (3) Community Services existed at the pleasure of the Board, and the City appointed one-half of Community Services officers, and (4) contracts between the Board and Community Services said that the Board "is the owner, and has ultimate control, of the television cable system." The Court said from these facts that "it is clear that the Board has ultimate control of community, and that Community is a municipal agent and should be treated as such for purposes of the doctrine of state action...." 857 F.2d at 358-59.
 
 
 24
 Each of the factors leading to the court's conclusion in Consolidated TV is absent here. First, CIC was not created by the city or an organ of the city. Rather, "[t]he incorporation and organization of CIC, the selection of its members and the initial actions of CIC occurred before [the] Village Council became involved in [the] activities of the Corporation." Moreover, CIC was solely incorporated by Frances F. Goins, without any mention of the municipality appearing in the articles of incorporation or in the corporate regulations. Second, CIC's structure and operation were not determined by the Village. To the contrary, "CIC controlled its own internal activities in accordance with the provisions of its articles of incorporation and code of regulations." Id. The regulations also reserved to the CIC exclusive rights to amend the regulations without further approval of the Village.
 
 
 25
 Third, although the Village had plenary control over CIC to the extent that it could terminate its existence by passing an ordinance, the Village had no right to appoint CIC members as the Board did in Consolidated TV. Ohio Rev.Code Ann. Sec. 1724.10 requires that only two-fifths of CIC members be elected or appointed officials. CIC made all appointments without involvement of the Village. Further, despite the fact that the Village could terminate CIC's existence through an ordinance, such power does not constitute "control" of the kind found in Consolidated TV. The power to terminate an organization is not tantamount to power to control the decisions made by that organization, especially in light of the fact that the Village in this case appeared totally disinterested in the decisions by the CIC. The abstract, theoretical power to terminate CIC's existence is not a sufficient indication that CIC was controlled by the Village. The facts that caused this Court in Consolidated TV to find that Community Services was a municipal agent entitled to state immunity under Hallie do not exist here.
 
 
 26
 Appellees also cite Ambulance Service of Reno, Inc. v. Nevada Ambulance Service, Inc., 819 F.2d 910 (9th Cir.1987). In that case, the defendant Regional Emergency Medical Services Authority ("REMSA") was a charitable corporation incorporated at the direction of the Washoe County District Board of Health. REMSA had the authority to grant or deny applications for ambulance service franchises. The plaintiff sued under section 1 of the Sherman Act when REMSA denied its application. The court held that REMSA was a public organization immune under Hallie because it was not pursuing its own economic interests. This case is also distinguishable from the instant appeal. The District Board of Health had significant involvement with the operation of REMSA, including the right to set rates and charges and to control the training and orientation of its personnel. Operational information had to be given to the Board monthly so it could closely monitor its activities, and in the event of default by REMSA, all equipment and contractual rights reverted to the Board. These were the facts that caused the Ninth Circuit to "treat REMSA as the instrument of the 'municipality' in the Hallie sense, and hold that active supervision by the State of Nevada [was] not required." Id. at 913. Such involvement and control of CIC by the village is absent, as discussed above.
 
 
 27
 The remaining cases appellees cite are similarly inapposite. Boone v. Redevelopment Agency of San Jose, 841 F.2d 886 (9th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988) found state immunity, but did not analyze whether the defendant redevelopment agency was a public or a private entity. In Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority, 801 F.2d 1286 (11th Cir.1986), the defendant aviation authority was held immune from suit because it "was created by the Florida legislature to develop and administer public airports in the Tampa, Florida region. The Authority [was] a government arm of the State...." Id. at 1288. CIC, by contrast, was created without the involvement of the state or the Village and was not considered an arm of the state.
 
 
 28
 Appellees also cite Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc., 790 F.2d 1032 (2d Cir.1986). Dissimilarities between that case and the present appeal abound. In Cine, New York's Urban Development Corporation was given state action immunity in a Sherman Act suit. However, it differed significantly from the CIC. First, it was a "corporate, governmental agency of the state, constituting a political subdivision and public benefit corporation." Id. at 1035. CIC is not. See Op.Atty.Gen. No. 87-024 (1987) ("A community improvement corporation, organized pursuant to RC Chapter 1724 is not a 'political subdivision' as that term is defined in RC Sec. 2744.01(F)").[4] Two of New York's Urban Development Corporation's nine members were public officials, while the rest were designated by the governor and approved by the state senate. Id. at 1036. CIC appointed its own members with no input from the state or local government. Moreover, "[a]lthough a creature of statute, the [Urban Development Corporation] derives its powers directly from the State Constitution" and "exercises governmental authority." Id. This is not the case with CIC, which is free to act according to its own corporate regulations without oversight by the state. Thus, Cine is not persuasive authority for the assertion that CIC is a public entity.
 
 
 29
 None of these cases are similar enough for us to conclude that the District Court erred in holding that CIC was not a public entity. We agree with its decision that CIC, being independent and beyond the direct control of the Village, and incorporated without Village involvement, was a private actor not entitled to state action immunity.
 
 
 30
 The Ohio Attorney General, as amicus, argues a slightly different position. He admits that CIC is not a "public subdivision," but contends that it is not a purely private actor either. It is rather a hybrid entity, a fusion of private structure and organization with public functions and interests. Although Hallie articulated the different requirements necessary for a public or private entity to claim immunity, it did not provide a test for categorizing an entity as public or private. The Attorney General urges that we apply a functional analysis in deciding whether Hallie state action immunity should apply when it is not clear whether the actor is public or private. We need not rule on the wisdom of this test, since the District Court's conclusions are supported even if analyzed under the Attorney General's suggested framework.
 
 
 31
 The Attorney General's position is based on Hallie 's premise that state immunity should be given to an actor if that actor is pursuing a policy in furtherance of a state interest. For private actors, "the requirement of active state supervision serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." 471 U.S. at 46, 105 S.Ct. at 1720. When the actor is a municipality, there is no need to show supervision because it is presumed to be acting in the public interest. Id. at 47, 105 S.Ct. at 1720. Because Hallie 's grant of immunity is predicated on the fact that the actor's alleged anticompetitive conduct is done pursuant to state policy, the Attorney General argues that the public/private distinction is less a matter of rigid, nominal classification than it is a matter of identifying the actor's function. If the entity is found to be behaving as a public entity pursuing public interests, it should be afforded immunity; if it is pursuing predominantly private interests, it should not be. The Attorney General maintains that active state supervision is but one way of ensuring conduct is pursuant to state policy. He argues that several factors require a finding that CIC acted pursuant to state policy, thus entitling CIC to Hallie immunity. For the reasons outlined below, we reject this conclusion.
 
 
 32
 Amicus first argues that in a prior decision in this case, this Court held that CIC acted pursuant to state policy in denying appellant's bond application. While this is true, it does not indicate that CIC was performing a government function. More importantly, however, to claim immunity CIC must have been actively supervised by the state (assuming it was not a public entity), rather than merely acting pursuant to state policy. Amicus also argues CIC meetings were subject to public scrutiny under the Sunshine Act. However, there was no public control over those meetings, and CIC's decisions were made exclusively by that organization according to its corporate regulations. Even the election of new members was done without public participation. Allowing public attendance at the meeting of an otherwise private organization does not transform it into a public entity.
 
 
 33
 Amicus also argues that CIC was the agent of the Village. Although CIC approved of bonds on behalf of the Village, and therefore acted as its "agent," this argument ignores the reality that CIC was an independent body, making independent decisions without the input, advice, involvement, or oversight of the Village or any other governmental body. The District Court found that the "Village of Ottawa does not review or amend a decision of CIC rejecting a request for industrial revenue bonds." Appellees do not challenge this finding, and it is not clearly erroneous. Nor do appellees challenge the court's factual finding that "CIC was not considered by the State as a municipality or agency of a municipality, but simply as a body of people organized for the purpose of economic development."
 
 
 34
 The Attorney General next argues that because 40% of the governing board was required to be elected or appointed officials, there was a "most powerful check" that CIC was used for state purposes. As discussed above, although CIC was required to have 40% public officials on its governing board, it was free to appoint people of its choosing. The presence of public officials does not indicate public control, especially when 60% are not public officials.[5]
 
 
 35
 Amicus next claims there is general state oversight of CIC, even if there is no active state supervision, because the articles of incorporation must be approved by the Attorney General, the Department of Development must annually review CIC's reports, the Secretary of State can cancel the articles of incorporation, and the common pleas court can oversee dissolution of CIC. These arguments are without merit. Approval of the articles of incorporation by the Attorney General does not make the entity public. All private corporations under Ohio law must file their articles of incorporation with the Secretary of State, Ohio Rev.Code Ann. Sec. 1701.04, and the articles must be approved by the Secretary. Ohio Rev.Code Ann. Sec. 1701.08. If the Attorney General's logic were followed, all corporations would become public entities because they must all be officially approved by the state. Similarly, the argument that the court of common pleas can oversee dissolution of CIC is meritless, since that court has authority to oversee the dissolution of all corporations. Ohio Rev.Code Ann. Sec. 1701.91. Finally, annual review of CIC reports does not indicate CIC's public nature. Ohio Rev.Code Ann. Sec. 1785.06 requires the filing of annual reports by all private professional corporations with the Secretary of State, and failure to do so results in cancellation of the articles by the Secretary. None of the factors amicus points to indicate that CIC was "public," since the factors apply with equal force to private corporations as well.
 
 
 36
 Amicus finally argues that Chapter 1724 constrains CIC's actions by requiring it to act consistently with a plan approved by the political subdivision. However, appellees do not contest that CIC is free to act independently of the Village and according to its own articles and regulations. Acting within the legislative parameters of chapter 1724 and the plan approved by the subdivision does not evidence a public function.
 
 
 37
 On remand from the previous judgment of this Court, the District Court considered the question whether CIC was a public or private entity. It determined that it was private and therefore not entitled to immunity. Its finding was supported by the record and the relevant case law. Its judgment should not be disturbed.
 
 
 38
 C. Propriety of Granting Judgment Notwithstanding the Verdict
 
 
 39
 Having determined that appellees are not entitled to state action immunity under Hallie, we next address whether judgment notwithstanding the verdict was appropriately granted. Our standard of review is to view the evidence "in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor." Morelock v. NCR Corp., 586 F.2d 1096, 1104 (6th Cir.1978), cert. denied, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). The motion is appropriately granted if we are of the opinion that the evidence so favors the movant that "reasonable minds could not come to a different conclusion." Id. at 1105. See also Gillham v. Admiral Corp., 523 F.2d 102, 109 (6th Cir.1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976).
 
 
 40
 The Supreme Court has limited the inferences that can be drawn from ambiguous evidence in Sherman Act section 1 cases. In Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) and Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Court established guidelines for determining when an agreement to conspire under section 1 can be inferred. Monsanto requires a plaintiff to present evidence which "tends to exclude the possibility" that the alleged conspirators were acting independently, rather than in concert pursuant to an agreement. Id. at 764, 104 S.Ct. at 1471. In Monsanto, an agricultural products manufacturer terminated one of its dealers who sold products at a price lower than other dealers. The terminated dealer sued under section 1, claiming that the manufacturer and distributors had an agreement to set prices. As evidence of this claim, the plaintiff proffered complaints made to the manufacturer by other distributors that the terminated dealer was setting prices too low. The Court noted that these complaints could have stemmed from the dealers' independent business interests, rather than from an agreement. However, the Court found there was also evidence tending to exclude the possibility of independent action, including testimony that the manufacturer told the distributor that if it did not maintain the suggested retail price, it would not receive adequate amounts of certain chemicals. There was also a newsletter suggesting that the manufacturer would terminate distributors that did not honor its pricing. This evidence was sufficient to create a jury question as to the existence of a conspiratorial agreement.
 
 
 41
 Matsushita held that a section 1 plaintiff must "show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action" if the plaintiff relies on ambiguous evidence. 475 U.S. at 588, 106 S.Ct. at 1356. A fact finder may not infer a conspiracy if there is no economic motive to conspire and there is a nonconspiratorial explanation for the alleged conspiratorial conduct. As the District Court noted, Monsanto and Matsushita together establish
 
 
 42
 a two-part inquiry for evaluating the propriety of summary judgment in an antitrust conspiracy case: (1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.
 
 
 43
 Gibson v. Greater Park City Co., 818 F.2d 722, 724 (10th Cir.1987). A plaintiff thus fails to demonstrate a conspiracy if, using ambiguous evidence, the inference of a conspiracy is less than or equal to an inference of independent action. See Matsushita, 475 U.S. at 588, 106 S.Ct. at 1356 ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy").
 
 
 44
 Appellants do not dispute the District Court's statement of law. They argue, however, that it misapplied the law to the facts of this case. Upon reviewing the evidence that appellants claim supports the jury's finding, we conclude that the District Court did not err in granting judgment n.o.v.
 
 
 45
 In marshalling evidence that "tends to exclude the possibility of independent action," appellants first claim that CIC members had a pecuniary interest in preserving downtown businesses and protecting them from competition. Appellants argue this indicates concert of action. However, only appellee Edelbrock owned a store that would compete directly with appellants' proposed development. Appellee Beckman owned a jewelry store, but the record reveals no evidence that appellants' development project would compete with it. A third appellee owned an interest in a downtown store through a corporation. No other CIC members had any personal business interest in the downtown area. Appellants also argue that CIC members were friends of downtown businessmen and that some CIC members committed themselves to protecting existing businesses from competition. According to appellants, this establishes a motive to conspire. It does not, however, tend to exclude the possibility that appellees acted independently, which is appellants' burden. Indeed, having a business interest in the community makes it more likely that they voted out of their own individual self-interest to preserve the status quo than voting pursuant to a conspiracy with other CIC members. Each of the three members had an economic motive to deny the I.R.B.'s regardless of any agreement with other CIC members. The effect of their business interests is thus highly ambiguous--it evidences individual motivation to deny the I.R.B.'s as much as it evidences any kind of conspiratorial conduct. Even if we were to agree that it establishes a motive to conspire, appellees' conduct is just as consistent with independent action. C.I.C. members made their decision to approve or deny I.R.B.'s based on specific criteria,[6] one point of which was any new development's impact on the local economy.[7] Although appellees could identify no specific business that would be injured by appellants' development project, their denial of I.R.B.'s based on their concern for downtown business was, as the District Court held, "as consistent with independent conduct as with a conspiracy." In sum, the presence of a motive to conspire based either on personal pecuniary interests of CIC members or commitments made to local businessmen to protect them from competition does not "tend to exclude the possibility of independent action" as required by Monsanto.
 
 
 46
 Appellants also argue the District Court erred when it stated that discussions between CIC members and local businessmen did not "conclusively establish that defendants entered into an illegal conspiracy." Appellants claim the court erroneously required them to "conclusively" prove a conspiracy, rather than to merely show evidence tending to exclude the possibility of independent action. This argument misapprehends the District Court's statement when read in context. It is clear from the District Court's opinion that, despite use of the word "conclusively" in discussing appellants' evidence, it applied the correct test. In examining the same evidence, we find that merely discussing I.R.B.'s with local businessmen does not tend to exclude the possibility that CIC members acted independently in denying the I.R.B.'s. There is nothing unusual about informal contacts between CIC members and local businessmen. In fact, appellant Smith talked to CIC members himself to solicit votes in favor of his I.R.B.'s. Discussions with local businessmen do not tend to establish that appellees did not act independently.
 
 
 47
 The other arguments appellants rely on to show there was an adequate basis for the jury to find a conspiracy are even less compelling. Appellants claim that there was no evidence of independent action, that there was evidence of parallelism, that appellees had the opportunity to conspire, and that appellees' actions were consistent with a conspiracy to block competition. These arguments, however, misconstrue appellants' burden in proving the existence of a conspiracy under section 1. None of these arguments, even if accepted as true, tend to exclude the possibility of independent action. All may be consistent with conspiratorial conduct but, as noted throughout this opinion, proving that conduct is consistent with a conspiracy is not sufficient to allow an inference of conspiracy absent some evidence which tends to exclude the possibility that conduct is independent. We conclude that the evidence appellants relied upon at trial to establish a conspiracy was ambiguous, establishing conduct that was as consistent with independent action as with a conspiracy. Since appellants failed to provide any evidence tending to exclude the possibility that the alleged conspiratorial conduct was in fact the result of independent action, the jury was not entitled to infer the existence of a conspiracy.
 
 
 48
 For the foregoing reasons, we AFFIRM the District Court's grant of judgment n.o.v. for appellees.
 
 
 
 *
 Honorable Robert M. McRae, Jr., United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 This appeal only involves the Sec. 1 claim, since appellants voluntarily dismissed the Sec. 2 claim at trial
 
 
 [2]
 This Court amended its opinion remanding the case to say "[i]f the District Judge determines that the Community Improvement Corporation made the effective decision [to deny appellant's bond request], then evidence should be taken on whether in rendering its decision the Community Improvement Corporation was actively supervised by the state." 774 F.2d at 163. This modified the earlier opinion which said "... was actively supervised by the Village of Ottawa."
 
 
 [3]
 After appellees rested their case-in-chief, the following dialogue occurred:
 The Court: What do you want to do, renew your motion?
 Mr. Schnorf: I do.
 The Court: It will be overruled, so that will take care of the technicalities.
 Mr. Schnorf: I understand.
 The Court: All right.
 Mr. Schnorf: And the record should indicate that the defendants now rest their case-in-chief.
 The Court: I don't know whether you should renew your motion after you rest but any way--
 Mr. Schnorf: I understand.
 The Court: Just to protect the record.
 
 
 [4]
 The court's holding that the Development Corporation was entitled to state immunity is founded on its status as a political subdivision of the state. "The [Urban Development Corporation], like a municipality, is by statute a political subdivision of the state.... Therefore its interests must be defined as public rather than private...." 790 F.2d at 1047
 
 
 [5]
 Note that this is different from Cine 42nd Street Theater Corp., where two of New York's Urban Development Corporation's nine members were required to be public officials. In that case, where the court held the Corporation to be a public entity, the other members were appointed by the governor and approved by the senate. Thus, all members of that group were placed with government oversight
 
 
 [6]
 The criteria are:
 
 
 [1]
 Creates and preserves jobs and employment opportunities in the Municipality and the State of Ohio
 
 
 [2]
 Improves the economic welfare of the people of the Municipality and of the State of Ohio
 
 
 [3]
 Encourages and causes the maintenance, location, relocation, expansion, modernization and equipment of sites, buildings, structures and appurtenant facilities for industrial, commercial distribution and research activities within the Municipality and thereby preserves, maintains or creates additional opportunities for employment within the Municipality
 
 
 [4]
 Maintains and increases the tax valuation of property within the Municipality in order that tax revenues may be available to provide services for the preservation of public peace, health, safety and general welfare of the Municipality
 
 
 [5]
 Is consistent with social, economic and geographic factors present in the Municipality
 
 
 [6]
 Is not inconsistent with job needs and skills present in the Municipality
 
 
 [7]
 Is not inconsistent with environmental factors present in the Municipality
 
 
 [8]
 Is in accordance with its applicable planning and zoning
 
 
 [7]
 Appellants argue that CIC could not consider the impact on any single entity such as the downtown area. However, the criteria does allow the CIC to consider the impact of new development on the entire municipal area, which includes downtown