April WALLACE and Vickie Gwin, et al., Plaintiffs–Appellants,

v.

BANK OF BARTLETT, Boatmen's Bank of Tennessee, First American National Bank, First Tennessee Bank, N.A., Leader Federal Bank for Savings, National Bank of Commerce, NationsBank, TriState Bank of Memphis and Union Planters National Bank, Defendants–Appellees.

No. 94–5499.

United States Court of Appeals, Sixth Circuit.

Argued May 1, 1995.

Decided June 2, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied July 7, 1995.

William H. Baughman, Jr. (argued), Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Ira M. Thomas (briefed), Memphis, TN, for Margaret M. Baker.

Robert L. Green (briefed), Neely, Green, Fargarson & Brooke, Ira M. Thomas, Memphis, TN, for Alvin Barnes, April Wallace, Vickie Gwin, et al.

Bill R. Heste (briefed), Hester & McCrary, Bartlett, TN, for Bank of Bartlett.

J.O. Bass, Jr., Bass, Berry & Sims, Nashville, TN, for First American.

John C. Speer, Baker, Donelson, Bearman & Caldwell, Memphis, TN, for First Tennessee Bank.

Robert E. Craddock (briefed), Memphis, TN, for Leader Federal Bank.

Frank J. Glankler, Jr. (briefed), C. Barry Ward, Robert L. Hutton, Glankler, Brown, Gilliland, Chase, Robinson & Raines, Memphis, TN, for National Commerce Bancorporation.

H. Frederick Humbracht, Jr. (briefed), Boult, Cummings, Conners & Berry, Nashville, TN, for Nationsbank of Tennessee.

Elijah Noel, Jr. (briefed), Noel & Sugarmon, Memphis, TN, for Tri–State Bank.

J. Richard Buchignani (briefed), Robert L. Crawford, McDonnell Boyd, Thomas J. Walsh, Jr., Wolff Ardis, Memphis, TN, for Union Planters Nat. Bank.

C. Lee Cagle, David Wade (argued and briefed), Martin, Tate, Morrow & Marston, Memphis, TN, for Boatmen's Bank of Tennessee.

Before: KENNEDY and SUHRHEINRICH, Circuit Judges; HILLMAN, District Judge.*

KENNEDY, Circuit Judge.

Plaintiffs brought this action against nine banks doing business in Tennessee (the "Banks")[1], alleging that the Banks conspired, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to fix the amount of certain fees charged to bank customers. The fees at issue are the fees the Banks charge customers for writing checks upon accounts with insufficient funds ("NSF") and for depositing checks which are returned uncollected ("DIR").[2] Plaintiffs are individuals who allegedly paid NSF fees at each of the respective defendant banks.

Plaintiffs admit that they do not have any direct evidence of any agreement or conspiracy among the Banks to set prices but contend that the uniformity of these fees shows there is tacit collusion. The District Court granted summary judgment in favor of defendants. Plaintiffs appeal, arguing that the District Court erred in determining that they failed to present sufficient evidence to exclude the possibility that the Banks were pursuing legitimate independent business interests. For the following reasons, we affirm.

## I.

■ We review a district court's grant of summary judgment de novo, *Hanover Ins. Co. v. American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir.1994), "view[ing] all facts and inferences drawn therefrom in the light most favorable to the nonmoving party." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992). Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment where there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Summary judgment is appropriate if plaintiffs failed to make a showing sufficient to establish any element essential to their claims and on which they bear the burden of proof. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993).

Summary judgment may be granted even in a complex antitrust case because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Electric. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474 (6th Cir.), *cert. denied*, 498 U.S. 855, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990), we established a two-part inquiry for evaluating a summary judgment motion in an antitrust conspiracy case:

> (1) [I]s the plaintiff's evidence of conspiracy ambiguous, *i.e.*, is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy;

---

* The Honorable Douglas W. Hillman, United States District Judge for the Western District of Michigan, sitting by designation.

1. The Banks are Bank of Bartlett, Boatmen's Bank of Tennessee, First American National Bank, First Tennessee Bank, N.A., Leader Federal Bank for Savings, National Bank of Commerce, NationsBank, Tri–State Bank of Memphis and Union Planters National Bank.

2. For purposes of brevity, we will refer to both of these types of fees as "NSF" throughout the opinion.

and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Id.* at 483 (citation omitted). We held that a plaintiff cannot demonstrate a conspiracy "if, using ambiguous evidence, the inference of a conspiracy is less than or equal to an inference of independent action." *Id.*

## II.

■ It is not necessary for an antitrust plaintiff to introduce any direct evidence of a conspiracy. Rather, a conspiracy can be inferred from business behavior which evidences "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Nurse Midwifery Associates v. Hibbett,* 918 F.2d 605, 616 (6th Cir.1990) (citation omitted), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991).

■ However, parallel pricing, without more, does not itself establish a violation of the Sherman Act. *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954); *General Business Sys. v. North Am. Philips Corp.,* 699 F.2d 965, 976 (9th Cir. 1983). Courts require additional evidence which they have described as "plus factors." Examples of these "plus factors" include actions contrary to a defendant's economic self-interest, *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1456 (11th Cir.1991), product uniformity, exchange of price information and opportunity to meet, *Wilcox v. First Interstate Bank, N.A.,* 815 F.2d 522, 525–26 (9th Cir.1987), and a common motive to conspire or a large number of communications, *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253–54 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

■ Plaintiffs first contend that because the Banks all charge essentially the same fee for NSF checks, they have conspired to fix the level of fees. In addition, plaintiffs argue that the public disclosure of the fees and the

alleged failure of the Banks to set NSF fees relative to cost are the plus factors which, in addition to the alleged parallel pricing, show a violation of section 1. Plaintiffs also rely on the affidavits of two experts stating that defendants would not be able to charge high NSF fees without collusion.

The Banks assert that the prices are not sufficiently similar to constitute parallel pricing. The District Court examined the record, however, and concluded that, when the inferences from the evidence were construed in favor of plaintiffs, "the variances between the fees are not as drastic as the Banks contend."[3] The Banks do not raise this issue of the similarity of the prices on appeal. Rather, they argue that even assuming their prices are similar, plaintiffs have failed to present other evidence sufficient to support an inference of a conspiracy.

Plaintiffs mainly rely on the fact that the Banks do not set NSF fees relative to the cost of processing NSF checks as evidence of a conspiracy beyond parallel pricing. In support of their argument, plaintiffs cite 12 C.F.R. § 7.8000 (1995) which provides that:

(a) All charges to customers should be arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding or discussion with other banks or their officers.

(b) Establishment of deposit account service charges, and the amounts thereof, is a business decision to be made by each bank according to sound banking judgment and federal standards of safety and soundness. In establishing deposit account service charges, the bank may consider, but is not limited to considering:

(1) Costs incurred by the bank, plus a profit margin, in providing the service;

(2) The deterrence of misuse by customers of banking services;

(3) The enhancement of the competitive position of the bank in accord with the bank's marketing strategy;

---

**3.** The Banks argued to the District Court that on a statewide level, NSF fees varied by as much as 44%, varied by as much as 26.67% on a citywide level, and varied within individual banks' branches by as much as 90%. The NSF fees varied from $10.00 to $20.00 per transaction.

(4) Maintenance of the safety and soundness of the institution. . . .

Plaintiffs contend that under this regulation, the Banks must take into account the costs of processing NSF and DIR checks and that their failure to do so is evidence of a conspiracy.

Defendants concede that they do not price NSF charges in relation to cost. They note that although section 7.8000 states that the Banks *may* consider costs, it does not require costs to be taken into account. We agree with the District Court that "[t]he failure of the banks to consider one factor does not require the conclusion that the banks conspired to set the level of NSF fees."

It is clear from the affidavits submitted by the Banks that they do in fact take many legitimate factors into account besides costs. Several of the Banks submitted affidavits stating that they established high prices for NSF checks because they did not want to attract customers who write these checks and wanted to deter customers from this behavior.[4] One bank stated that it set NSF fees based on "what the market is charging, government regulations, and business judgment." Another bank considers profitability, handling and processing costs, competitive position, and the maintenance of safety and soundness.

Plaintiffs also argue that the manner in which NSF fees are publicized allows the banks to collude in setting prices. However, the Banks' publication of prices is at least as consistent with their independent interests as it is with collusion.

First, the Banks certainly have a legitimate interest in providing customers relevant information regarding the fees associated with their checking accounts. The Banks also have an interest in publishing prices to attract or deter consumers from opening accounts. "[P]ermitting an inference of conspiracy [based on the dissemination or advertising of retail prices] would make it more difficult for retail consumers to get the information they need to make efficient market decisions." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 448 n. 14 (9th Cir.1990), *cert. denied*, 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991).

Most of the Banks admit they evaluate the fees charged by other banks when they set fees. "The exchange of price information among competitors is not a per se violation of the antitrust laws." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1505 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978). The Banks naturally are interested in surveying the market to determine what other banks are charging in order to make strategic competitive decisions. All of the affidavits submitted by the Banks contained statements to the effect that there was no agreement or collusion between them, tacit or otherwise. Although publication and evaluation of prices can serve as a means to violate section 1,[5] plaintiffs have produced no evidence that this is occurring.

---

4. For instance, one bank's affidavit stated that "[w]hen NSF, DRI and other overdrafts are honored, unsecured and often unsound extensions of credit result which may go uncollected. In addition, check kiting and other fraudulent schemes that result in losses to banking institutions can arise out of presentation of overdraft items. Setting NSF charges at their current levels ... is designed to discourage this undesirable conduct." Another affidavit stated that "[e]xcessive overdrafts are detrimental to the banking system because at some level they will cause a loss of confidence in checks as a medium of payment. . . . First American does not want customers who continually bounce checks. First American's procedures require that the account of a customer who bounces an excessive amount of checks in a twelve month period be closed."

Another bank's affidavit contained the statement "[t]o contend that [NSF charges are] an area of business that is encouraged by NationsBank is pure folly. The ideal customer is one who keeps large balances in the account, makes deposits, writes few checks and is never overdrawn."

5. For instance, public dissemination of prices can violate the Sherman Act where the publication serves little purpose other than facilitating collusion, *Petroleum Products*, 906 F.2d at 448, or where prices are published in advance by a price leader to communicate its intention and to gauge reactions of competitors. *Id.* at 446. The fees are published here together with other charges to advise customers of the charges they must pay.

Plaintiffs offer two affidavits in support of their allegations that the Banks have tacitly conspired to fix prices. First, they have submitted the affidavit of Allen Buckalew, an economist with a Master of Science degree. Buckalew reviewed the Banks' depositions, 12 C.F.R. 7.8000, the Banks' pricing history and a presumed cost per NSF check of $.15 to $1.50 and stated that:

> Assuming all of the above, and further assuming that defendants have historically totally failed to openly compete in the market for customers on the basis of more attractive NSF charges, I can testify that based on well-accepted economic theories dealing with supply and demand in our American economy, defendants have been able to maintain these artificially excessive NSF/DIR charges by means of a tacit agreement not to compete on such charges and to set the prices at the inflated amounts which they presently are.

The Banks contend that this affidavit fails to raise a genuine issue of material fact because the expert offers no additional facts or evidence and relies on conclusory allegations.

Buckalew's affidavit is not sufficient to defeat the Banks' motion for summary judgment. In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, —— U.S. ——, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), the Supreme Court held that an economist's expert testimony which was based on insufficient facts could not be relied on to support a jury verdict. *Id.* at ——, 113 S.Ct. at 2598. The Court stated that "[e]xpert testimony is useful as a guide to interpreting market facts, but is not a substitute for them." *Id.* Buckalew's conclusions are based on nothing more than facts which, as we have already stated, are equally consistent with independent actions by the Banks. For instance, the Banks readily admit that they have "totally failed to openly compete" because they do not want to attract customers who write checks with insufficient funds to cover them.

Plaintiffs submitted another affidavit from Antonio L. Zate, a certified public accountant with a masters degree in economics who has worked as a bank examiner for the Federal Reserve Bank.[6] According to Zate, the banking industry's income derived from interest has been declining since the early 1980s while income derived from "non-interest income sources" such as NSF fees has been increasing. It is Zate's "educated and professionally-gained opinion" that the "enormous profit" from NSF fees would not have been possible without collusion between banks. Zate's opinion, however, does not exclude the possibility that the Banks wanted to keep these fees high to discourage NSF check-writing or that, by increasing NSF fees to compensate for lost interest revenue, the Banks were maintaining the safety and soundness of the institution as permitted by 12 C.F.R. 7.8000. Plaintiffs' expert evidence is equally consistent with independent action as it is with conspiracy.

Finally, plaintiffs assert that they have not been able to produce evidence to respond to defendants' summary judgment motion because defendants denied them access to any discovery. However, at a status conference held on February 2, 1994, plaintiff's counsel agreed with the court that "there [was] a consensus that the summary judgment motion can be resolved, and [it was] not dependent on [plaintiffs] obtaining anything else." Furthermore, the information plaintiffs sought apparently had to do with the actual costs to the Banks of processing NSF checks, and defendants stated that they were not challenging plaintiffs' assumptions concerning costs for the purposes of the summary judgment motion. Thus, the District Court properly granted summary judgment in favor of defendants.

### III.

For the foregoing reasons, we AFFIRM the District Court's grant of summary judgment.

---

**6.** The Banks argue that the District Court should not have considered Zate's affidavit. They contend that the affidavit was submitted after the discovery deadline established by the District Court's scheduling order and that plaintiffs stated that no experts had been retained in their responses to expert interrogatories. The District Court found it unnecessary to reach these issues in light of its order granting summary judgment. Likewise, we need not address these arguments.