RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0139P (6th Cir.)
File Name: 02a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHIGAN PAYTEL JOINT
VENTURE; MICHIGAN
PAYTEL, INC.; NOAH, INC.,
     *Plaintiffs-Appellants,*

     *v.*

CITY OF DETROIT; MICHIGAN
BELL TELEPHONE CO. d/b/a
AMERITECH; CHARLES BOYCE
d/b/a U AND M
COMMUNICATIONS,
     *Defendants-Appellees.*

No. 00-1516

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-72758—George E. Woods, District Judge.

Argued: September 21, 2001

Decided and Filed: April 23, 2002

Before: NELSON and MOORE, Circuit Judges; KATZ,
District Judge.*

_____

*The Honorable David A. Katz, United States District Judge for the
Northern District of Ohio, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Gordon S. Gold, SEYBURN, KAHN, GINN, BESS & SERLIN, Southfield, Michigan, for Appellants. Morley Witus, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, Kenneth J. McIntyre, DICKINSON WRIGHT, Detroit, Michigan, James W. McGinnis, Detroit, Michigan, for Appellees. **ON BRIEF:** Gordon S. Gold, Tova Shaban, SEYBURN, KAHN, GINN, BESS & SERLIN, Southfield, Michigan, Alan C. Harnisch, HARNISCH & GADD, Bingham Farms, Michigan, for Appellants. Morley Witus, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, Kenneth J. McIntyre, Scott T. Seabolt, DICKINSON WRIGHT, Detroit, Michigan, James W. McGinnis, Detroit, Michigan, for Appellees.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. In this dispute concerning the bidding process for the provision of pay telephone service in the lock-up facilities of the City of Detroit ("City"), Plaintiffs-Appellants Michigan Paytel Joint Venture ("MPJV"), Michigan Paytel, Inc. ("MP"), and Noah, Inc. ("Noah") appeal the district court's dismissal of their antitrust and civil rights claims and grant of summary judgment in favor of the City, Michigan Bell Telephone Company d/b/a Ameritech ("Ameritech"), and Charles Boyce ("Boyce"). For the reasons that follow, we **AFFIRM** the decision of the district court.

## I. BACKGROUND

On March 2, 1995, the City of Detroit Police Department ("DPD") issued a Request for Proposal ("1995 RFP") and began to solicit bids for an in-cell telephone contract. The

In this case, Noah did not set forth any allegations that it suffered special injury. The complaint alleges that the City authorized and entered unlawful contracts calling for the expenditure of public funds. However, Noah fails to allege with particularity how the DPD's contract with Ameritech will cause it to suffer loss or damage as a taxpayer.

Moreover, Noah failed to provide "a clear statement of present or prospective damages to taxpayers." *Kaminskas v. City of Detroit*, 243 N.W.2d 25, 27 (Mich. Ct. App. 1976). Noah describes the harm as the costs incurred by the City when the DPD issued a second RFP and allowed Ameritech to amend its bid and thus win the contract. The DPD itself recognized that rejecting the bids submitted in response to the 1995 RFP and requesting new proposals would mean a delay and cost additional time and energy. However, given the fact that Ameritech will bear all costs for the installation and maintenance of the in-cell telephone system, we are not persuaded that the plaintiffs have shown present or prospective damage to taxpayers. We therefore affirm the district court's decision that Noah lacks taxpayer standing.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

project involved installing and servicing pay telephones in the DPD's lock-up facilities. The 1995 RFP explicitly stated that the City made no final commitments in soliciting bids.[1] On April 26, 1995, MPJV submitted a bid in response to the 1995 RFP, which incorporated a new telephone that MP had developed for use in jail cells.[2] Three additional vendors, including Ameritech, submitted their own bids for the project. MPJV noticed defects in Ameritech's bid related to the design

---

[1] "The issuing of this Request for Proposal (RFP) does not commit the City of Detroit to award a contract, to pay any costs incurred in the preparation of a proposal under this request, or to procure or contract for services or supplies. The City reserves the right to accept or reject any or all proposals received as a result of this request, to negotiate with all qualified sources, and to cancel in part or in its entirety this RFP, if it is deemed to be in the best interest of the City to do so." Joint Appendix ("J.A.") at 166.
   Ameritech submitted a copy of the 1995 RFP as an exhibit attached to a motion to dismiss. The plaintiffs argue that the district court should not have considered matters outside the pleadings. Appellants' Br. at 17. However, as Ameritech observes, the plaintiffs referred to the 1995 RFP in their complaint. The 1995 RFP was central to the plaintiffs' claims and thus was properly considered. *See Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) ("Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim.").

[2] The telephone is recessed into the wall, making the intercom virtually indestructible. Unlike traditional box units, which consist of a handset connected to the telephone by a long steel cord, this design prevents prisoners from (1) converting the cord or handset into a weapon and (2) vandalizing or otherwise abusing the phones.

of the telephone[3] and the proposed charge for collect calls[4] and so informed the City.

In a January 24, 1996, memo to Benny Napoleon, then-DPD Executive Deputy Chief ("Napoleon"), Alan L. Miller, then-Second Deputy Chief of Financial Operations ("Miller"), concluded that each of the four bids failed to comply with at least one aspect of the requirements in the 1995 RFP and recommended that the DPD reissue the bid.[5]  In particular, Miller claimed that MPJV "'failed to submit annual reports or audited financial statements,' pursuant to the directives of the RFP" and that Ameritech's proposal had equipment and legal flaws.  Joint Appendix ("J.A.") at 73.  However, Napoleon advised in a department memo dated February 20, 1996, that the 1995 RFP only required "information relative to a company's 'Financial Standing,'" which MPJV had provided.  J.A. at 74.  Napoleon warned that "simply rejecting all bids

---

[3]The plaintiffs allege that Ameritech's bid contained the traditional box unit design and thus failed to comply with the 1995 RFP's requirement that the telephone equipment be "vandalism proof."  J.A. at 14 (Compl. at ¶ 20).

[4]The plaintiffs allege that Ameritech's bid proposed an illegal rate for collect calls, which would qualify as predatory pricing and thus violate federal antitrust laws.

[5]The City submitted a copy of the memo itself as an exhibit attached to a motion for summary judgment.  As the plaintiffs argue, this memo was not accompanied by an affidavit or document that attested to its validity or authenticity.  Appellants' Br. at 19.  We have previously "ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Logan v. Denny's, Inc.*, 259 F.3d 558, 570 (6th Cir. 2001) (quoting *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993)).  Because the plaintiffs raised this issue in the court below, they have not forfeited this objection.  *See Johnson v. United States Postal Serv.*, 64 F.3d 233, 237 (6th Cir. 1995).
However, Napoleon essentially reiterates Miller's conclusions in the memo that the plaintiffs attached to their complaint as Exhibit C.  We therefore rely on Napoleon's references to Miller's memo.

Under Michigan law, a taxpayer has standing to sue if he can show a "threat that he will sustain substantial injury or suffer loss or damage as a taxpayer, through increased taxation and the consequences thereof." *Menendez v. City of Detroit*, 60 N.W.2d 319, 323 (Mich. 1953) (noting that this prerequisite "is uniformly true of all the Michigan cases considering this subject"); *Rayford v. City of Detroit*, 347 N.W.2d 210, 215 (Mich. Ct. App. 1984).  "The plaintiff must allege with particularity how the alleged illegal act will" cause injury through increased taxation.  *Killeen v. Wayne County Rd. Comm'n*, 357 N.W.2d 851, 856 (Mich. Ct. App. 1984).  In *Killeen*, the court denied standing to the plaintiffs because their allegations of increased taxation resulting from a collective bargaining agreement between a county road commission and a labor organization were "general, conclusory and speculative." *Id.*

The district court specifically found that Noah did not have "standing for a taxpayer relief claim," because it "ha[d] failed to indicate with particularity how general tax revenues will be affected by the City's actions culminating in the grant of the contract to Ameritech."  J.A. at 115-16 (Order Granting Def. City of Detroit's Mot. to Dismiss and/or for Summ. J.).[11]  The district court then declined to exercise supplemental jurisdiction and dismissed the plaintiffs' "remaining state law counts" without prejudice.  J.A. at 117.  On appeal, the plaintiffs argue that the district court's view on the issue of standing is obiter dictum and thus not binding.  We believe that the district court's explicit findings indicate an actual holding against Noah's standing to bring a taxpayer claim.

---

[11]In addition, in the accompanying footnote, the district court stated, "Even if this Court were to find that Noah sufficiently established standing to bring a taxpayer action, dismissal [without prejudice] would nevertheless be appropriate . . . because no viable federal claims remain." J.A. at 116-17 n.8.  This conditional language provides further support for our conclusion that the district court held that Noah did not have standing.

In this case, the plaintiffs base their civil rights claim on (1) the City's decision to reject MPJV's 1995 bid and to issue a second RFP, (2) a premature statement by Boyce that the City had awarded the contract to Ameritech, and (3) the City's cancellation of a hearing on MP's bid protest and appeal. Although the district court did not specifically find that no conspiracy existed among the defendants, it doubted the sufficiency of the plaintiffs' allegations, at least with respect to Boyce:

> Neither the facts, nor reasonable inferences drawn from them, connect Defendant Boyce to any common act designed to deprive Plaintiffs of their constitutional rights. Plaintiffs further fail to allege that Defendant Boyce ever communicated with the other Defendants regarding Plaintiffs, let alone together coordinated a scheme to wrongfully deprive Plaintiffs of their rights.

J.A. at 89-90 (Order Granting Def. Charles Boyce's Mot. to Dismiss at 7). We conclude that the plaintiffs' allegations against the City and Ameritech similarly lack the requisite material facts and specificity necessary to sustain a conspiracy claim.

### C. Taxpayer Relief

Noah alleges that it resides in and pays taxes to the City, making this action a municipal taxpayers' suit in part. Michigan courts have historically limited the right of an individual taxpayer to sue a government agency for violation of a public right. *Killeen v. Wayne County Civil Serv. Comm'n*, 310 N.W.2d 257, 259-60 (Mich. Ct. App. 1981). A private individual has no standing to sue on behalf of the public at large; plaintiffs must allege a grievance distinct from any held by the public to bring suit against the government. *Id.* at 260 ("Public grievances must be brought into court by public agents and not by private intervention.") (citing *Home Tel. Co. v. Mich. R.R. Comm'n*, 140 N.W. 496 (Mich. 1913)).

without a solid rationale could leave the DPD open to a charge of 'arbitrariness.'" J.A. at 75. MPJV subsequently received the highest score when a DPD evaluation committee reviewed the four bids on April 4, 1996.

On April 16, 1996, Miller sent a memo to then-Chief of Police Isaiah McKinnon that contained the DPD evaluation committee's recommendation that the DPD "enter into negotiations with [MPJV]." J.A. at 78. According to MPJV, Miller then contacted MPJV counsel Melvin J. Hollowell, Jr., on July 30, 1996, with the news "that MP had been selected by the DPD as the winning bidder," and that negotiations would commence after Miller sent a form copy of the contract to MPJV. J.A. at 547 (Hollowell Aff. Ex. 1).

The DPD, however, exercised its right to reject all of the proposals received as a result of the 1995 RFP. On December 26, 1996, it issued a second Request for Proposal ("1996 RFP"), to which MP and Ameritech responded. The plaintiffs contend that MP's response to the 1996 RFP was "virtually the same" as MPJV's response to the 1995 RFP, J.A. at 17 (Compl. at ¶ 42), in contrast to Ameritech's 1996 bid:

> When Ameritech submitted its response to the 1996 RFP, [it] substantially revised [its] bid from 1995 by substituting a recessed phone application substantially similar to the one originally submitted by MPJV in response to the 1995 RFP. In addition, [it] submitted a different tariff rate than the one submitted in 1995, which did not conflict with the [Michigan Telecommunications Act].

J.A. at 17 (Comp. at ¶ 41). According to the plaintiffs, Ameritech, through Boyce as its representative, publicly announced before the conclusion of the rebidding process that Ameritech had won the DPD contract. The plaintiffs also allege that they submitted an appeal and protest to the City but that the City failed to grant them a hearing to address their claims. On July 22, 1998, the City Council passed a

resolution that awarded the DPD in-cell telephone contract to Ameritech.

On May 28, 1999, the plaintiffs filed a complaint in the district court alleging (1) violations of federal and state antitrust law, (2) interference with civil rights, (3) violations of state tort and contract law, and (4) conspiracy, and asking for taxpayer relief. The plaintiffs sought specific performance of the 1995 RFP, a preliminary and permanent injunction against performance of the 1995 and 1996 RFPs by Ameritech and the City, and damages and costs. On July 14, 1999, the City and Ameritech filed motions to dismiss and for summary judgment. Boyce later filed his own motion to dismiss and for summary judgment.

On July 30, 1999, two weeks after moving for summary judgment, the City filed a motion for a protective order to stay discovery. The matter was referred to a magistrate judge, who denied the City's motion. On March 28, 2000, the district court granted summary judgment in favor of the defendants, dismissing the plaintiffs' federal claims and declining to exercise supplemental jurisdiction over their state claims. This timely appeal followed.

## II. ANALYSIS

We review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and/or for summary judgment under Federal Rule of Civil Procedure 56. *Patmon v. Mich. Supreme Court*, 224 F.3d 504, 508 (6th Cir. 2000). In reviewing a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiffs and determine whether the plaintiffs undoubtedly can prove no set of facts in support of the claims that would entitle them to relief. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999). We accept all of the complaint's factual allegations as true, *id.*, but "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d

will control the exercise of discretion to accept or reject bids only "when necessary to prevent fraud, injustice or the violation of a trust." *Leavy*, 226 N.W. at 215 (citation omitted). In this case, the plaintiffs' allegation of fraud is based on the City's rejection of all bids submitted in response to the 1995 RFP and its issuance of the 1996 RFP, which the plaintiffs claim gave Ameritech the opportunity to copy MPJV's recessed telephone design and to correct the illegal proposed charge for collect calls. The plaintiffs also argue that the City held MPJV to a stricter standard in terms of its financial stability. Appellants' Br. at 30-31. However, there are insufficient facts to give rise to a conclusion of fraud or injustice in this case. *Cf. Communications Sys., Inc. v. City of Danville*, 880 F.2d 887, 891 (6th Cir. 1989) (observing, in holding that the defendant's award of a municipal cable television franchise was not arbitrary or capricious, that the plaintiff did not allege that city officials gained some personal benefit). Although the plaintiffs apparently believe that the DPD rigged the bidding process to award the contract to Ameritech, we are not persuaded that they have evidence to show that DPD or City officials had a vested interest in or stood to gain from the contract proceedings.

The plaintiffs allege that "a continuous and ongoing conspiracy" existed between the City, the DPD, Ameritech, and Boyce to interfere with their civil rights. J.A. at 33 (Compl. at ¶ 111). As stated by the district court, the conspiracy claim is viable only if MPJV had a constitutionally protected property interest. Liability attaches for a civil conspiracy if a plaintiff can prove that two or more defendants agreed to injure another by unlawful action and committed an overt act in furtherance of the conspiracy. *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). We have previously held that "vague and conclusory allegations unsupported by material facts" are insufficient to sustain a conspiracy claim under § 1983. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987).

broad discretion in the awarding of public contracts, and Michigan courts have repeatedly stated their willingness to "indulge the presumption that the authorities acted in good faith." *See, e.g., Kahn v. State Land Office Bd.*, 28 N.W.2d 103, 106 (Mich. 1947); *Leavy v. City of Jackson*, 226 N.W. 214, 215 (Mich. 1929); *Great Lakes Heating, Cooling, Refrigeration & Sheet Metal Corp. v. Troy Sch. Dist.*, 494 N.W.2d 863, 864 (Mich. Ct. App. 1992). In this case, both the 1995 and 1996 RFPs clearly specified that the City reserved "the right to reject any and all proposals" and to accept a bid only by signing a contract. J.A. at 171-72, 182.[9] MPJV thus cannot show that the City was limited in its discretion to award the contract.[10]

Even unfettered discretion, however, cannot be exercised in an arbitrary or capricious manner, because the purpose of the competitive bidding process is to avoid favoritism and corruption. *Lasky*, 89 N.W.2d at 522. Courts in Michigan

---

[9]Because the plaintiffs referred to the 1996 RFP in their complaint, and the 1996 RFP was central to the plaintiffs' claims, we may consider this document. *See supra* note 1.

[10]MPJV argues that the City's discretion in awarding contracts is limited under the lowest responsible bidder provisions of the Detroit City Code. Appellants' Br. at 25-26. The Detroit City Code specifies the manner in which the City's purchasing director may make purchases that entail a "major expenditure." Detroit City Code § 18-5-2. In the case of purchase contracts for equipment and supplies, a major expenditure is one that exceeds $50,000. Detroit City Code § 18-5-1.

However, MPJV fails to rebut the City's contention that the DPD contract was a revenue rather than a purchase contract. Appellee (City)'s Br. at 23-24. Revenue contracts are governed by Detroit City Code § 18-5-5, which requires the Detroit City Council to approve "all revenue contracts, regardless of dollar value." *Id.* On its face, the 1995 RFP states that one of its primary objectives is to gain "[a] new revenue source for the City of Detroit." J.A. at 166. The resolution passed by the Detroit City Council that awarded the DPD contract to Ameritech also described the contract as "a revenue contract . . . with compensation to be paid to the City." J.A. at 262. We agree with the City and conclude that the lowest responsible bidder provisions are not applicable in this case.

---

10, 12 (6th Cir. 1987). "[I]f the district court considered matters outside the pleading when ruling on a motion to dismiss, [we] will treat the motion as one for summary judgment." *Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir. 1999), *cert. denied*, 530 U.S. 1262 (2000).

Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of establishing the "absence of evidence to support the nonmoving party's case." *Patmon*, 224 F.3d at 508 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). No genuine issue of material fact exists when the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In reviewing a grant of summary judgment, we "must view all [of the] evidence in the light most favorable to the nonmoving party." *Darrah v. City of Oak Park*, 255 F.3d 301, 305 (6th Cir. 2001).

## A. Antitrust Claim

### 1. Municipal Action

The Sherman Antitrust Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The Act also makes it a felony to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." *Id.* § 2. In this case, the plaintiffs claim that the defendants violated the Act by trying to maintain Ameritech's dominance in the pay telephone service market in the Detroit metropolitan area.

The defendants contend that they are exempt from federal antitrust laws under the state action doctrine. In the landmark

case of *Parker v. Brown*, 317 U.S. 341 (1943), the Supreme Court, relying on principles of federalism and state sovereignty, held that states as sovereigns are exempt from antitrust liability under the Sherman Antitrust Act. *Id.* at 352. Because municipalities are not sovereign entities, they are not automatically exempt from the antitrust laws under *Parker*. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38 (1985); *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 50-51 (1982); *City of LaFayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412-13 (1978). However, a state acting in its sovereign capacity can immunize municipalities from antitrust liability by authorizing anticompetitive municipal activities. In *Boulder*, the Supreme Court adopted in the context of municipal action the two-prong test for antitrust immunity that a plurality of the Court had announced in *LaFayette*. *Boulder*, 455 U.S. at 51 (citations omitted). Under this test, municipalities are exempt from antitrust laws if they can establish (1) a "clearly articulated and affirmatively expressed" state policy to authorize anticompetitive conduct and (2) "active[] supervis[ion]" by the state itself. *LaFayette*, 435 U.S. at 410. Three years after *Boulder*, the *Hallie* Court held that a municipality was required to show only that a clearly articulated state policy authorized it to engage in anticompetitive conduct. *Hallie*, 471 U.S. at 46 (noting that "the requirement of active state supervision serves essentially an evidentiary function").

Grants of general or neutral authority to govern local affairs will not satisfy the "clear articulation" component of the state action exemption from antitrust liability. In *Boulder*, the Supreme Court held that Colorado's Home Rule amendment to its constitution, which vested in the City of Boulder "the full right of self-government in both local and municipal matters," 455 U.S. at 43 n.1 (quoting COLO. CONST. art. XX, § 6), did not clearly articulate a state policy to authorize anticompetitive conduct with respect to the regulation of cable television. *Id.* at 54-55. However, in *Hallie*, the Court clarified that "explicit authorization" by state legislatures to displace competition was not necessary to pass the clear

acceptance, and consideration, but also on the competency of the parties to enter into a contract.[8] *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. Ct. App. 1991). Individual officers generally do not have the power to bind the municipal corporation. *See, e.g.*, *Grant v. Common Council of Detroit*, 51 N.W. 997, 998 (Mich. 1892) (interpreting the city charter, which required the common council to approve public works contracts); *Johnson v. City of Menominee*, 434 N.W.2d 211, 213 (Mich. Ct. App. 1988) ("If the officer's act is beyond the limits of his or her authority, the municipality is not bound."). Furthermore, Michigan law charges those who make contracts with a municipality to know the limits of its power to contract. *Lasky v. City of Bad Axe*, 89 N.W.2d 520, 522 (Mich. 1958); *Utica State Sav. Bank v. Village of Oak Park*, 273 N.W. 271, 274 (Mich. 1937).

In this case, MPJV cannot prove that the City awarded it the DPD in-cell telephone contract. The City Council did not approve MPJV's 1995 bid, and Miller did not have the authority to enter into a binding contract on the City's behalf. Therefore, the plaintiffs did not have a legitimate claim of entitlement to the DPD contract.

**2. Abuse of Discretion**

A plaintiff may demonstrate a constitutionally protected property interest under *United of Omaha* by claiming that City officials had limited discretion in awarding the contract and that they abused this discretion. *United of Omaha*, 960 F.2d at 34. Under Michigan law, authorized officials have very

_____

[8] In Michigan, the Statute of Frauds requires that contracts unable "to be performed within 1 year from the making of the agreement" are void unless the agreement is made "in writing and signed with an authorized signature by the party to be charged." MICH. COMP. LAWS ANN. § 566.132 (West 2001). The Statute of Frauds is applicable in this case because MPJV's 1995 bid stated that the in-cell telephone contract would last for five years. Although numerous written documents are at issue in this case, the plaintiffs cannot establish the validity of any "contract" because the City made no commitment in writing.

state law to deprive the plaintiff of a definite liberty or property interest. *Charlie's Towing & Recovery, Inc. v. Jefferson County*, 183 F.3d 524, 527 (6th Cir. 1999). Property interests are created and defined by "an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir. 1997). A cognizable property interest arises when plaintiffs "have a legitimate claim of entitlement" (or "more than a unilateral expectation") to a particular benefit. *Roth*, 408 U.S. at 577.

To establish a protected property interest in its 1995 bid, MPJV must invoke some statutory or contractual right conferred by the State of Michigan that supports a legitimate claim to having its bid accepted. In *United of Omaha Life Insurance Co. v. Solomon*, 960 F.2d 31 (6th Cir. 1992), we articulated how disappointed bidders to a government contract can demonstrate a constitutionally protected property interest. They may show that they were awarded the contract and then deprived of it, or they may claim that state law granted the governmental entity limited discretion in awarding the contract, which the entity abused. *Id.* at 34.

### 1. Property Interest

Under the Detroit City Charter and the Detroit City Code, the Detroit City Council is charged with making most contracts for the City. Detroit City Charter § 4-122 (requiring approval by a resolution of the City Council for purchase contracts); Detroit City Code § 18-5-5 (requiring Council approval for contracts that exceed $5000 in value and all revenue contracts). It is undisputed in this case that the Detroit City Council neither approved the MPJV bid nor passed a resolution that awarded the contract to MPJV.

MPJV therefore bases its procedural due process claim on the allegation that Miller accepted MPJV's 1995 bid on the City's behalf. As at common law, the validity of Michigan contracts depends not only on the required elements of offer,

articulation test. *Hallie*, 471 U.S. at 44. The *Parker* exemption applies as long as the suppression of competition is the foreseeable or logical result of what the state authorizes. *Id.* at 42; *see also City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 372-73 (1991).

In this case, the plaintiffs' antitrust claims are based primarily on the allegation that Ameritech is engaged "in a pattern of unlawful and/or anti-competitive conduct calculated to attempt to monopolize the pay telephone service market in its CSA [certified service area] and to eliminate Michigan Paytel and MPJV as competitors." J.A. at 22 (Compl. at ¶ 68). The allegation as to the City itself is that "the City knowingly facilitated Ameritech's anti-competitive conduct by conspiring with Ameritech to circumvent the competitive bidding process to ensure Ameritech's monopolistic position in the pay telephone service market." Appellants' Br. at 37. The plaintiffs thus argue that the City's authority does not extend to facilitating Ameritech's alleged predatory pricing and unlawful cross subsidization of its unregulated division.

The Supreme Court has declared that there is no conspiracy exception to *Parker*. *Columbia*, 499 U.S. at 374. In that case, the City of Columbia, South Carolina, passed an ordinance restricting the size, location, and spacing of billboards. *Id.* at 368. The city acted under a state statute that authorized municipalities to "regulate and restrict" the use of land. *Id.* at 370 & n.3 (citation omitted). The plaintiffs in *Columbia* alleged that the billboard ordinance resulted from an anticompetitive conspiracy between city officials and a local billboard company that controlled virtually all of the relevant market. *Id.* at 367, 369. However, the Court rejected this argument, stating that "with the possible market participant exception, *any* action that qualifies as state action is '*ipso facto* . . . exempt from the operation of the antitrust laws.'" *Id.* at 379 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984)).

The issue in this case is the extent of the City's authority under the Home Rule City Act. The *Boulder* case, which held that the City of Boulder was not entitled to the state action exemption, is instructive because it involved "home rule" powers granted under an amendment to the state constitution. In *Boulder*, the Court placed particular emphasis on the fact that the amendment took a position "of mere *neutrality* respecting the municipal actions challenged as anticompetitive" and did not exhibit "an affirmative addressing of the subject [of cable television regulation] by the State." *Boulder*, 455 U.S. at 55. In *Hallie*, by contrast, the Court held that the municipality's anticompetitive activities were protected by the state action exemption, because the suppression of competition was a foreseeable result of a state statute that granted cities broad authority to regulate sewage systems, including the ability to refuse service to unannexed areas. *Hallie*, 471 U.S. at 41-42.

No Michigan statute expressly authorizes the City to execute an exclusive contract with a telephone service provider for telephone service in its prisons. However, the Home Rule City Act does grant the City the authority to bid out public contracts and to contract for the maintenance of its prisons. MICH. COMP. LAWS ANN. §§ 117.3(j) and 117.4e (West 2001). Under the Michigan Constitution, these provisions must be "liberally construed in the[] favor" of municipalities. MICH. CONST. art. VII., § 34. We therefore conclude that the City is immune from antitrust liability because anticompetitive effects are the logical and foreseeable result of the City's broad authority under state law and the Michigan Constitution to bid out public contracts for the maintenance of City prisons. As the district court observed, "Under the bidding process, there would be only one successful bidder. Thus, only one bidder would have the right to install and service the pay telephones." J.A. at 110 (Order Granting Def. City of Detroit's Mot. to Dismiss at 11).

contrast, we held in *Consolidated Television* that a non-profit corporation was entitled to state-action immunity because it was a municipal agent. *Consolidated Television*, 857 F.2d at 358-59.

In this case, the plaintiffs have consistently alleged that "public corruption and private dishonesty" influenced the City's decision to award the DPD contract to Ameritech. Appellants' Br. at 4. This fact distinguishes this case from *City Communications*, where we affirmed the district court's grant of summary judgment to the defendant on an antitrust claim against a successful bidder. *City Communications*, 695 F. Supp. at 914. The *City Communications* plaintiff conceded that corruption did not taint the award of a cable television franchise to a private defendant, *id.*, and we agreed with the district court's conclusion that the plaintiff had not shown that the private defendant controlled the city's decision-making process. *City Communications*, 888 F.2d at 1088; *City Communications*, 695 F. Supp. at 915. The plaintiffs in this case also raise the factual question "[w]hether the City of Detroit delegated decision making authority to Ameritech." Appellants' Br. at 42. Nevertheless, we conclude that the district court did not err in granting summary judgment to Ameritech because there is no genuine issue as to whether the City was the effective decision maker in granting Ameritech the DPD contract. Viewing the evidence in the light most favorable to the plaintiffs, we recognize that Ameritech may have influenced the DPD's decision to rebid the in-cell telephone contract, but we are not persuaded that this influence was so excessive that a reasonable jury could find that the DPD or the City lost control of the decision-making process.

## B. Civil Rights Claim

MPJV claims that the City violated its constitutional right to due process by not awarding it the contract for the DPD in-cell telephone project. To state a valid claim under § 1983, a plaintiff must show that the defendant acted under color of

actors is whether the municipality or the regulated party made the effective decision that resulted in the challenged anticompetitive conduct. If the municipality or a municipal agent was the effective decision maker, then the private actor is entitled to state action immunity, regardless of state supervision. If the private actor was the effective decision maker, due to corruption of the decision-making process or delegation of decision-making authority, then it is not immune, unless it can show that it was actively supervised by the state.[7]

Thus, in *Riverview*, we held that a non-profit corporation, which was "independent and beyond the direct control of the Village, and incorporated without Village involvement," was subject to antitrust liability because it was not a municipal agent and it made "independent decisions without the input, advice, involvement, or oversight of the Village or any other governmental body." *Riverview* III, 899 F.2d at 481-82. In

---

[7] At oral argument, Ameritech cited the Supreme Court's *Columbia* decision for the proposition that municipal supervision is sufficient to immunize a private actor from federal antitrust liability. However, the *Columbia* Court held that the private defendant in that case was entitled to immunity under *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), which "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Columbia*, 499 U.S. at 379-80 (quoting *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965)). The *Noerr-Pennington* exemption thus applies to lobbyists and others whose legitimate attempts to influence governmental action are protected by the First Amendment as political activity. In contrast, our effective-decision-maker doctrine addresses whether a private defendant has actually corrupted or overtaken rather than merely influenced a municipality's decision-making process.

We recognize that other courts have extended state action immunity beyond this limit. *See, e.g., Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1079 (1st Cir. 1993) (holding that "municipal supervision of private actors is adequate where authorized or implicit in the state legislation"). However, until the Supreme Court squarely addresses the question whether municipal supervision protects the anticompetitive acts of private parties, we are bound by this circuit's decision in *Riverview* and must read *Ticor* to preclude *Parker* immunity in such cases absent active supervision by the state itself.

---

## 2. Private Action

The state action exemption may also entitle private defendants to protection from antitrust liability. *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56-57 (1985); *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980); *City Communications, Inc. v. City of Detroit*, 888 F.2d 1081, 1088 (6th Cir. 1989). However, to assert a *Parker* defense successfully, private parties must establish both a clearly articulated state policy to authorize anticompetitive conduct and active state supervision of private anticompetitive conduct. *Midcal*, 445 U.S. at 105. The Supreme Court has indicated that municipal regulation of a private party does not satisfy the requirement of active state supervision:

> The active supervision requirement stems from the recognition that where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. . . . The requirement is designed to ensure that the state-action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies. To accomplish this purpose, the active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct. . . . The mere presence of some state involvement or monitoring does not suffice.

*FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 634 (1992) (quoting *Patrick v. Burget*, 486 U.S. 94, 100-01 (1988)); *see also Hallie*, 471 U.S. at 46 n.10 ("Where state or municipal regulation [of] a private party is involved, however, active state supervision must be shown, even where a clearly articulated state policy exists.").

We have previously held that private entities are immune from antitrust liability only if they are actively supervised by

the state. *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 478-79 (6th Cir. 1990) ("*Riverview* III"). In other words, the requirement of active state supervision cannot be satisfied by municipal oversight. We expressly held that state, rather than municipal, supervision is required in *Riverview Investments, Inc. v. Ottawa Cmty. Improvement Corp.*, 774 F.2d 162 (6th Cir. 1985) ("*Riverview* II"). *Id.* at 163. However, we have also held that private defendants who are regulated by a municipality are entitled to protection under the state action exemption as long as the municipality is the "effective decision maker." *City Communications*, 888 F.2d at 1088, 1090; *see City Communications, Inc. v. City of Detroit*, 695 F. Supp. 911, 914-15 (E.D. Mich. 1988); *cf. Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1499-501 (10th Cir.), *cert. denied*, 522 U.S. 948 (1997). Recognizing that our previous discussions of this complicated subject matter have been less than perfectly clear, we will examine the precedents in some detail to clarify state action immunity in the context of private anticompetitive conduct that is regulated by a municipality.

In *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 769 F.2d 324 (6th Cir. 1985) ("*Riverview* I"), a real estate developer sued a non-profit corporation, which the Village of Ottawa had authorized to approve the issuance of industrial revenue bonds, after the corporation voted against certifying the developer's project. *Id.* at 326. The district court granted summary judgment to the defendant, but we reversed and remanded for further consideration that part of the district court's order ruling that the corporation was protected by the state action exemption from the federal antitrust laws. *Id.* at 330. We instructed the district court to determine on remand the following questions:

(1) Whether the Village of Ottawa or the Ottawa Community Improvement Corporation made the effective decision to reject appellant's bond application. If the District Judge concludes that the Village of Ottawa did, the order denying relief should be reentered. (2) If the

District Judge determines that the Community Improvement Corporation made the effective decision, then evidence should be taken on whether in rendering its decision the Community Improvement Corporation was actively supervised by the *Village of Ottawa*. If there was such supervision, the decision was protected under state action immunity, otherwise not.

*Riverview* II, 774 F.2d at 163. We later revised this opinion, instructing the district court to address whether "the state" instead of "the Village of Ottawa" actively supervised the corporation. *Id.* In making this modification, we explained that our earlier understanding of municipal supervision "may not be a completely accurate statement of the law" after the *Hallie* and *Southern Motor Carriers* decisions. *Id.* On remand, the district court found that the corporation was not supervised by the state. *See Riverview* III, 899 F.2d at 479. The corporation then appealed, arguing that it was immune from antitrust liability as a municipal agent and citing, inter alia, *Consolidated Television Cable Service, Inc. v. City of Frankfort*, 857 F.2d 354 (6th Cir. 1988), *cert. denied*, 489 U.S. 1082 (1989).[6] In our final opinion in the *Riverview* trilogy, we distinguished the case from *Consolidated Television* and agreed with the district court that the corporation was a private actor not entitled to state action immunity. *Riverview* III, 899 F.2d at 479-81.

The *Riverview* line of cases thus informs us that the basic question in antitrust cases that involve municipal and private

---

[6] In *Consolidated Television*, a private, for-profit corporation alleged that a nonprofit corporation had violated federal antitrust laws by unlawfully conspiring to prevent free competition between the two entities in the provision of cable television service for the City of Frankfort, Kentucky. *Consolidated Television*, 857 F.2d at 355. We concluded that the defendant was entitled to state action immunity from antitrust claims because it was a municipal agent, rather than a purely private actor, and thus did not have to show active state supervision. *Id.* at 358-60. Ameritech does not raise such an argument in this case.